WILLIAM S. GORDON, AS TRUSTEE UNDER A CERTAIN TRUST CREATED IN FAVOR OF FLORENCE S. HYMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELSIE B. PASKUS, AS EXECUTRIX OF THE ESTATE OF MARTIN PASKUS, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM S. GORDON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63561, 63562, 63568. Promulgated November 14, 1935.

*Arthur B. Hyman, Esq.*, for the petitioners.
*H. B. Linton, Esq.*, and *G. R. Sherriff, Esq.*, for the respondent.

---

OPINION.

MATTHEWS: These three cases, which were consolidated for hearing, came before us on determinations of deficiencies in income tax for the calendar year 1929 in the following amounts:

William S. Gordon, trustee for benefit of Florence S.
  Hyman _____ $80. 81
Elsie B. Paskus, executrix_____ 1, 415. 21
William S. Gordon_____ 282. 07

The question for determination is whether the petitioners realized taxable income and, if so, how much, on the distribution to them in 1929 of certain cash and stock by a syndicate in which they, with others, had been participants. The facts are few and, save for the ultimate fact of the fair market value of the stock distributed, are not in dispute.

On March 1, 1928, the three petitioners together subscribed $25,-000, or $8,333.33 each, to a syndicate organized by Carl H. Pforz-heimer & Co. as managers, to trade in the stock of the Consolidated Coppermines Corporation. The syndicate agreement provided that:

The Syndicate shall terminate on March 1, 1929, or earlier, in the discretion of the Managers, but it may be extended by the Managers for two additional periods of three months each and may likewise be terminated, in the discretion of the Managers, before the termination date of either of such extended periods. Promptly after such termination the Managers shall make final distribution of the Syndicate assets, whether in cash or in stock and cash, to the participants of the Syndicate. Partial distributions may be made proportionately at any time in the discretion of the Managers.

The managers were to have the "sole direction of the syndicate, with full power to buy or sell stock of said company at such time and at such prices as they may deem best" and were to receive 10 percent of the net profits as commissions. "All agreements and obligations of the Managers" were to "bind and be enforceable against the property and assets of the Syndicate and none thereof shall be binding upon any participant beyond his subscription to the Syndicate." Each participant was to pay on demand. His subscription could be made in cash, or, to the extent of 50 percent, in stock of the Consolidated Coppermines Corporation at a valuation of $6.50 a share. Each participant was to share in profits or losses in proportion to his participation:

The obligations of each participant hereunder shall be several and not joint; nothing herein shall make any participant a partner with any other participant or with the Managers nor shall make any participant liable to contribute more than the amount of his participation. The death of any participant shall not dissolve the Syndicate or terminate the rights or powers of the Syndicate Managers with respect to any interest of any participant

then living or dead, nor shall it entitle any participant then surviving or the representative of any participant then deceased to demand any dissolution, distribution or accounting or to withdraw any interest hereunder.

The syndicate managers were authorized to negotiate loans for the syndicate, pledge its assets, employ agents "and to transact the business of the Syndicate in such manner and form as they shall deem best." The agreement was to become effective when an aggregate of $750,000 had been subscribed. The syndicate agreement was "private and confidential" between managers and participants. Petitioners paid their subscription in cash.

The capital stock of the Consolidated Coppermines Corporation was in 1929 about 1,422,000 shares at a par value of $5. On August 31, 1929, the syndicate terminated by force of the agreement, and the syndicate managers proceeded to distribute to the participants, including the petitioners, the cash and the 77,000 shares which they then held. Each of the three petitioners received from the syndicate managers 856⅓ shares of stock of the Consolidated Coppermines Corporation and $2,711.11 in cash.

The fair market value of the Consolidated Coppermines Corporation stock, which was traded in during 1929 on the New York Curb Exchange, was at the time of the syndicate's distribution to petitioners $10 a share.

Petitioner Gordon, as trustee for Florence S. Hyman, in his return reported a gain of $2,941.11, computed on a value of $10 a share for the Consolidated Coppermines Corporation stock received. He reached this result by taking the total amount of cash received on the distribution, $2,711.11, adding the 856⅓ shares of stock at the above value, $8,563.33, and deducting the amount of the trust's cash participation in the syndicate, $8,133.33. Gordon, as an individual, and Paskus, reported the transaction, but no gain or loss.

Respondent contends that when a private syndicate liquidates and distributes to its participants all its assets, stock and cash, the gain or loss to the participant must be determined by taking the cash received by such participant plus the stock at a value equal to its cost to the syndicate, less the amount of cash contributed by the participant. On this theory, he computed a cost of $15.261 a share and determined a profit to each of the three petitioners of $7,446.28, with the resulting deficiencies.

Petitioners, on the other hand, contend that this was not a closed transaction resulting in profit or loss on the termination of the syndicate, but was merely the purchase by petitioners of so many shares of stock at a determined cost, the gain or loss on which must await a subsequent sale. Alternatively, petitioners contend that if the distribution by the syndicate to its participants of cash and stock results in the realization of income, measured by the cash so

received plus the fair market value of the stock at the time of distribution, less the cash invested, then the fair market value was at that time less than $10 a share. Petitioners seek to maintain their contention as to market value by showing the decline of Consolidated Coppermines Corporation stock after the stock market crash of October 1929, which followed about two months after the syndicate's distribution, and to infer from that fact a highly inflated market value, not representative of the true value of the stock in August 1929.

The first question is obviously whether the syndicate's distribution was a closed transaction resulting in the realization of income, and this is determined by the nature of the syndicate formed under the agreement. The petitioners contend that they and the other contributors to the syndicate were joint adventurers who bought certain Consolidated Coppermines Corporation stock through a syndicate, it is true, but who were individual owners of the stock from the moment of the syndicate's purchase; and consequently, that no income would be realized by the petitioners until they should sell their stock.

With this construction we can not agree. Two cases decided in the Second Circuit, in which the instant case arises, dispose of this contention. In *Wild* v. *Commissioner*, 62 Fed. (2d) 777, the court considered a taxpayer who had made contributions to a syndicate organized under an agreement very similar to that here. There, as here, the syndicate manager was to have complete control of the buying, selling, and managing of the stocks and bonds, and was to end the venture and liquidate the syndicate at its pleasure, when all capital and profits should be distributed, although partial distributions might be made earlier. The precise question there raised was whether the individual contributor to the syndicate was taxable on profits earned but not distributed to him. The answer depended upon whether the syndicate was a partnership, or such a joint venture as interposed no fiduciary to insulate the beneficial owners from taxation. If the latter, whether it was an association or a trust was immaterial. The court decided that such a syndicate, considered in the light of the common law and the law merchant, the New York decisions being taken as evidence of the general law, was not an " ordinary partnership " within the meaning of the revenue acts. *Copland* v. *Commissioner*, 41 Fed. (2d) 501. The court considered also the possibility that the syndicate, although not a partnership, might have made its members coowners of property managed by a common agent, but rejected it, L. Hand, J., saying:

\* \* \* That can hardly be its full measure. The manager was at least entitled to take title in his own name and was to have absolute control. There

was no provision for the substitution of another by the members' choice; they were to be passive beneficiaries only. * * *

In *Glenmore Securities Corporation* v. *Commissioner*, 62 Fed. (2d) 780; certiorari denied, 289 U. S. 754, the same court had before it the question whether all or any part of a sum equal to the taxpayer's original contribution to a syndicate was taxable to the contributor when it was distributed by the syndicate. The taxpayer contended that it was not, but constituted merely a return of its capital under the syndicate agreement by which capital was to be repaid first. The Commissioner treated the total profits of the syndicate as if it had been a partnership and allocated to each member, including the taxpayer, three quarters of his proper proportion of the profits (the last quarter being deducted as manager's commissions) as income for the year. The court held that the syndicate was not a partnership, but an entity distinct from its members, and sustained the Commissioner on the ground that whether the syndicate was a trust or association, where a distribution had been made to a contributor without impairing the syndicate's capital, the burden of showing that the distribution was a return of capital and not income fell on the taxpayer, and it had failed to meet it. The *Glenmore* case is relevant here only in that it treated the transaction between syndicate and contributor as closed, with a resulting profit. The instant case raises no question of the return of the base before the calculation of profits, such as that in *Burnet* v. *Logan*, 283 U. S. 404, upon which petitioner relies, or the *Glenmore* case, for there was here confessedly a distribution of all assets held by the syndicate, which was then dissolved.

The test of whether a distribution of stock by the syndicate managers to the participants shall be treated as a closed transaction and thus the occasion of realization of income by the latter, depends, it is evident, upon whether participants and managers are one, and this determination in turn upon the measure of control which the former have relinquished to the latter. The syndicate agreement is the best evidence of the intent of all parties. Where the managers are no more than mere agents, the participants stand in the relation of partners or joint venturers, at all times able to deal as they please with their own property. A distribution by managers to subscribers in such circumstances passes nothing to the latter, therefore, which they did not have before. *J. Henry Dick Estate*, 20 B. T. A. 637. But where the measure of control given the managers is unfettered, so that their investment, sale, reinvestment and general disposal of the subscribers' stock or cash temporarily entrusted to them is beyond the power of the subscribers to forbid or to regulate, the managers in the person of the syndicate assume a corporate will and

entity independent of the contributors. As we have said, it is immaterial whether we call such an entity an association or a trust, it has a reality of its own apart from its contributors. It is evident that while the profits are still in the hands of the managers they are still subject to the risk of loss in future dealings and are not beyond jeopardy until they are distributed to the syndicate members. *Duffin v. Lucas*, 55 Fed. (2d) 786. The members, by transferring to the managers dominion over their contributions, embarked on an enterprise the profits of which would ultimately be theirs, but only when distributed to them. The distribution, whether intermediate or final, marks a point of rest in the transaction. Their realization of gain is then actual, but until then it is only contingent. When the distributed gain is cash no one can doubt that it is then taxable to the member. By the same token, profits distributed in the form of stock become then, and then only, taxable to the member. He thereby acquires something which he did not have while the syndicate was still in operation.

When we look at the syndicate agreement here the conclusion is unavoidable that all substantial powers over the cash and stock contributed had passed to the managers. They had sole direction of the syndicate, they might pledge its assets, all their contracts were binding on the participants, and, to put beyond cavil any question of the contributors' interest in or control over their contributions until the ultimate distribution by the managers on termination of the syndicate, it was expressly provided that " nothing herein shall make any participant a partner with any other participant or with the managers." And in order that the ordinary incident of partnership, liability beyond one's contribution and for the amount of all partnership obligations, might not arise, it was provided that no participant should be liable for more than his contribution, that his liability was several, not joint. In such circumstances we think that the distribution by the syndicate managers to the contributors was a closed transaction and petitioners were taxable on any profit above their original contributions.

We come now to the question of how petitioner's gain is to be calculated. Respondent contends for the difference between the petitioners' original contributions and the cash plus the stock distributed, taken at its *cost* to the syndicate. Petitioners contend that if the transaction was closed the true measure of gain is the difference between their contributions and the cash plus stock distributed, at its then fair market value. Respondent's contention rests, apparently, on the theory that true market value of the stock can not be lower than the price which the syndicate paid for it. We know of no such presumption, and if we have fairly stated respond-

ent's argument we can not accept his view, but think that petitioners' proposed basis of computation is correct.

The only question left is the amount of petitioner's gain, the measure of it being, as we have said, the difference between their contributions and the cash plus stock, at fair market value, received on the syndicate's liquidation. We have found that the fair market value of the stock of the Consolidated Coppermines Corporation on August 31, 1929, was $10 a share. It was then freely traded in on the New York Curb Exchange at this price and, for that matter, at " low " never fell below 8⅞ for the next month and maintained an average of well over 9½. Petitioners urge upon us that the syndicate's operations had inflated the market for this particular stock, that inflation on the eve of the stock market crash in October was general, that 77,000 shares of this stock sold at once would depress the market. These reasons are factitious. The long accepted test of value for tax purposes is what a willing buyer will give a willing seller. It is a practical test. Under all the circumstances of this case, the stock exchange quotations show this amount. We need not go beyond them and indulge in speculation upon the effect of incalculable factors, unforeseeable at the time. *Caroline W. Edwards et al., Executors*, 31 B. T. A. 879. We think for practical purposes market quotations fairly reflect fair market value.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

TRAMMELL, ARUNDELL, MURDOCK, and MELLOTT dissent.