ESTATE OF DANIEL GUGGENHEIM, DECEASED, FLORENCE GUGGEN-
HEIM, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 77675.   Promulgated February 2, 1939.

*Montgomery B. Angell, Esq., Paul B. Barringer, Jr., Esq., Weston
Vernon, Jr., Esq.,* and *Henry Breckenridge, Esq.,* for the petitioner.
*Chester A. Gwinn, Esq., E. G. Sievers, Esq.,* and *Charles E. Lowery,
Esq.,* for the respondent.

286

## OPINION.

MELLOTT: Section 302 (a) of the Revenue Act of 1926 provides, in substance, that the value of the gross estate of a decedent shall be determined by including therein the value, at the time of his death, of his interest in all property, real or personal, tangible or intangible. The parties have stipulated the value of a portion of the property and property rights owned by this decedent and the extent of his interest in other property. Effect will be given to the stipulations in settlement under Rule 50. In addition, the parties have stipulated the facts pertaining to the decedent's interest in the new firm; the special deposit of $79,900; the trust created for M. Robert Guggenheim and others; and many of the facts tending to show value or lack of value in the property to be evaluated.

The first item with reference to which the parties are not in agreement as to value, but in connection with which they have agreed upon many of the facts, is the decedent's interest in the old firm. All items necessary to determine the value of this interest have been stipulated except (a) the value, at the date of death, of 1,109,859 shares of the common stock of Anglo-Chilean; and (b) the value of $25,325,000

open account loans made by the firm to Anglo-Chilean. Having determined these facts, it will then be necessary to determine (c) the effect, if any, upon the decedent's interest in the firm of certain alleged "Contingent Liabilities of the Decedent to the Old Firm." These questions will be considered in the order stated under the general subject of

### I.—Decedent's Interest in Old Firm.

(a) *Value of 1,109,859 shares Anglo-Chilean stock.*—The parties agree that "value" as used in section 302 (a), *supra*, means "the fair market value" of the property or property rights. Art. 13, Regulations 70; *Ithaca Trust Co.* v. *United States*, 279 U. S. 151; *Brooks-Scanlon Corporation* v. *United States*, 265 U. S. 106; *Frank J. Kier et al., Executors*, 28 B. T. A. 633; *Eleanor Lansburgh, Administratrix*, 35 B. T. A. 928. Recognizing that "fair market value" is primarily a question of fact to be determined from all the competent evidence, *Heiner* v. *Crosby*, 24 Fed. (2d) 191; *James Couzens*, 11 B. T. A. 1040; they defined it in their hypothetical questions to the witnesses as "the price at which a seller is willing to sell at a fair price and a buyer is willing to buy at a fair price, neither being under any compulsion to trade and both having reasonable knowledge of the facts." The definition is simple and reasonably accurate. Cf. *Crowell* v. *Commissioner*, 62 Fed. (2d) 51. A judicial determination of the fact is quite difficult; but it must nevertheless be made.

Before reviewing the evidence the contentions of the parties will be briefly stated. Respondent contends that market quotations provide the best, most definite, and most easily ascertainable measure of fair market value; that they disclose what actual willing buyers and sellers have determined it to be; and that where such prices are available no other evidence of value should be considered. In support of this contention he cites several court and Board decisions holding, in effect, that, in the absence of exceptional or extraordinary conditions giving an abnormal value for the moment to the stock, or a showing of peculiar or unusual circumstances affecting its value, the price, as reflected by the trading in the stock on a fair, "unrigged" market must be accepted as its fair market value. The market quotation on the crucial date was 22⅝, which was the price at which 400 shares sold on September 29, 1930.

Petitioner contends that the stock had no fair market value, tested by any of the established theories of valuation—earnings, dividend yields, liquidation values, book values, etc.; that in determining the question all facts existing on or before the date of the death of the decedent, as well as all facts which might reasonably have been anticipated from them should be considered; that the prices on the "curb" were artificial and unsound and therefore entitled to no weight;

that the market was exceedingly "thin" and represented merely a "speculative" value fixed by those willing to take a "long chance"; that market prices are merely one factor to be taken into consideration in determining value; and that the courts and this Board have consistently refused to attach any more significance to them.

It is true, as respondent contends, that, generally speaking, the prices at which stocks are bought and sold on the open market furnish the best evidence of value. *Grant Co.* v. *Duggan*, 94 Fed. (2d) 859; *Rice* v. *Eisner*, 16 Fed. (2d) 358; certiorari denied, 273 U. S. 764; *T. W. Henritze*, 28 B. T. A. 1173; *Anita Owens Hoffer*, 24 B. T. A. 22; *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513; *Susan T. Freshman*, 33 B. T. A. 394; *William S. Gordon*, 33 B. T. A. 460. But they do not constitute the only evidence of value and are not always conclusive. *Heiner* v. *Crosby, supra; Crowell* v. *Commissioner, supra; Hazeltine Corporation* v. *Commissioner, supra; Rogers* v. *Strong*, 72 Fed. (2d) 455; *Safe Deposit & Trust Co. of Baltimore, Executor*, 35 B. T. A. 259; affd., 95 Fed. (2d) 806; *Laird* v. *Commissioner*, 85 Fed. (2d) 598. Market value is primarily a question of fact and all evidence tending to establish it should be considered. The prices at which shares of stock are sold on the market may be, and probably are, preferable from the standpoint of simplicity of administration to an evaluation made by an analysis of assets, earnings, future prospects of the issuing company, and other factors tending to establish the value of such stock; but we can not exclude all evidence other than market prices simply because to do so simplifies our task. This was the ruling made throughout the hearing. It was based upon a recognition of the fact that our responsibility is to determine judicially the value of a large block of stock. Obviously a purchaser of more than a million shares of the stock of a corporation might reasonably have been expected to make a more exhaustive study or examination of the affairs of the issuing corporation than would have been made by a purchaser of a few hundred shares. The petitioner was therefore permitted to show all of the data which a prospective purchaser and seller of a large block of stock would have considered before agreeing upon its fair market value, to the end that the Board might be placed in a position to make a fair and intelligent determination of the question presented. This included evidence of events occurring prior to decedent's death; facts known to exist on that date, including market prices; and evidence tending to show facts which might reasonably have been foreseen or anticipated on the date of death. The basic facts are shown in our findings. Some of the evidence upon which they are based will be referred to briefly; but no attempt will be made to make a complete summary of all of the evidence or to assign to every fact its precise relation to the conclusion reached.

The pampas of Chile contain the world's largest known deposits of nitrate. By a process of leaching the crushed ore or caliche in which the nitrate is contained, it may be recovered in commercial quantities and used as a fertilizer or in the manufacture of explosives. It has been so recovered and used for approximately a century and for many years prior to the death of the decedent it had been Chile's chief source of revenue. Prior to the World War, Chilean nitrate occupied a dominant position in the nitrogen industry of the world, notwithstanding the fact that nitrogenous products were also being recovered as a byproduct of the coke industry and were being produced in small amounts synthetically. Germany demonstrated during the World War that a nation could produce synthetically all of its necessary supply of nitrogen, and since then plants have been constructed in other nations. As a result, Chile, as is graphically shown in finding No. 66, lost its position of dominance in the industry, though the amount of nitrate she processed and sold did not decrease. This, in brief, was the picture when the old firm decided to engage in the commercial production of Chilean nitrate on a large scale.

The business of the Guggenheims was primarily the promotion and development of commercial and mining properties. They were leading figures in this field. In 1923 they sold their Chilean copper interests at a profit of approximately $70,000,000. This enterprise having been terminated so successfully, it was natural that other similar ones should be sought for development. The Chilean nitrate industry was then using an antiquated, inefficient, hand-mining method of producing nitrate, known as the Shanks process. Experiments conducted by the engineering staff of the old firm had by that time disclosed that modern production methods could be successfully applied to that industry. This experimentation resulted in the development of the Guggenheim process, demonstrated it to be far more efficient than the Shanks process, and indicated that if it were placed in general use at least 40 percent more saleable nitrate could be secured from a given area at a saving of approximately $5 per metric ton. Shortly thereafter, in December 1924, Anglo-Chilean was organized; and its use of the Guggenheim process demonstrated that twice as much nitrate could be recovered out of a given area as could be obtained by the Shanks process.

After the organization of Anglo-Chilean, the Guggenheims transferred to it certain nitrate bearing lands which they had purchased, and loaned it large sums of money for the construction of the Maria Elena Guggenheim process plant. In 1925 the corporation acquired railway and port facilities and additional nitrate lands. While the Maria Elena plant was being constructed in 1925 and 1926, Anglo-

Chilean produced all of its nitrate in three Shanks process plants from hand-mined ore. The construction of this plant to a minimum capacity of 260,000 tons was completed in April 1927 and mechanical mining operations were started for the first time. Production began at a low rate because of the necessity of training Chilean workmen and adjusting the various low scale units. In 1927 the company advised its stockholders that it had decided, in view of the highly satisfactory results obtained from the operation of the plant, to increase its capacity to approximately 500,000 tons of nitrate per year, and in 1928 it announced its intention to center eventually all production at the Maria Elena plant.

In 1929 Anglo-Chilean acquired a controlling interest in Lautaro of Delaware, which in turn owned all of the common stock of Lautaro, Ltd. The latter corporation had the most extensive holdings of nitrate bearing lands in Chile, and was the largest producer of Chilean nitrate. The stockholders of Anglo-Chilean were advised that it intended to introduce the Guggenheim process into the operations of Lautaro, Ltd., and it was estimated that "when the new Guggenheim Process plant of the Lautaro Company is completed and in full operation the annual earnings of the Lautaro Company after depreciation and depletion will be at the rate of approximately $1.66 for each share of" Lautaro of Delaware stock.

During 1929 and 1930 Anglo-Chilean was gradually working toward its objective, i. e., the production of nitrate under the Guggenheim process at the Maria Elena plant from wholly mechanically mined ore. Its Shanks process plants were shut down in March 1930. At the time of the decedent's death, additions and alterations were being made at the Maria Elena plant with a view to increasing the efficiency of its operations and to lowering production costs. The change from hand to mechanical mining was not completed until November 1930.

During the years prior to the decedent's death, the operations of Anglo-Chilean resulted in deficits (finding 101), all of which were reported to its stockholders in semiannual and annual reports. One of the important factors causing such deficits was that during these years Anglo-Chilean was in a transitory or development stage. It had not as yet operated a completely finished Guggenheim process plant using only mechanically mined ore. As finding 97 shows, the amount of nitrate produced in the Maria Elena plant from mechanically mined ore was relatively small until the fiscal year ending June 30, 1930. Other important factors contributing to the deficits were high interest charges, quota restrictions imposed on producers by the Nitrate Producers Association, and export taxes. During the year ended June 30, 1930, Anglo-Chilean sold 444,808 metric tons of

nitrate, which was approximately 149,678 tons in excess of its quota, and was compelled to purchase the amount oversold at a price of $5,691,328 from other less fortunate producers.

At the time of the Marsh report in January 1930, the future prospects of the Chilean nitrate industry were not particularly bright. The producers of synthetic nitrogen had absorbed most of the increase in the world consumption of nitrogen following the World War; prices received for Chilean nitrate had been steadily declining; and Chilean producers, with the exception of Anglo-Chilean and Lautaro, Ltd., had taken no steps to modernize their methods of producing nitrate or to lower their costs of production. According to the Marsh report, most of the producing companies in Chile, even with a 17 shilling f. a. s. selling price, showed a general lack of earnings. Anglo-Chilean, the owner of the only modern low-cost Guggenheim process plant, was hampered in the marketing of its product by quota restrictions imposed by the Nitrate Producers Association. Under such circumstances, it is not surprising that the old firm and the officers of Anglo-Chilean should initiate steps to remedy the situation.

The steps leading to the consolidation of the Chilean nitrate industry and the formation of Cosach have been set forth in our findings. The objects sought to be accomplished were (1) the reduction of costs by concentrating production, to a large extent, in efficient Guggenheim process plants, eliminating 30-odd boards of directors, and placing all of the management in one company; (2) the elimination of the export tax by taking the Government of Chile in as a partner; and (3) the creation of one company which "could present a united front everywhere and deal as an entity rather than through the Nitrate Producers Association." The Chilean nitrate producers were confident that the solution of their difficulties lay in utilizing new processes, constructing new plants, and in reorganization. In the report to the stockholders of Anglo-Chilean covering the fiscal year ending June 30, 1930, it was stated that: "With the contemplated consolidation of the Chilean industry, and the closing of high-cost plants, it is expected that the entire production of your company's Maria Elena Plant will be marketed currently, with a corresponding increase in earnings."

The evidence convinces us, and we have found as a fact, that it was reasonably foreseeable on September 28, 1930, that Cosach would soon be organized; that Anglo-Chilean would receive in exchange for its assets over 8,000,000 shares of Cosach B stock; and that its liabilities, with the exception of those growing out of the Baburizza transaction, would be assumed by Cosach. Petitioner has asked us to find that the plan set forth in the "Outline of Plan Proposed by Government of Chile for the Rationalization of Chilean Nitrate

Industry" was never put into effect; that Guggenheim Brothers found that the Cosach plan as incorporated in Law No. 4863 was unworkable due to legal difficulties and practical obstacles; and that the plan as contained in such law was not carried out.

No effort will be made to point out all of the evidence justifying the making of the finding which has been made or our refusal to make the requested findings; but the following observations are not amiss:

The original proposal to merge the nitrate industry of Chile into one corporation having from five to seven plants operating under the Guggenheim process was submitted by the Guggenheim Brothers to the Chilean Government and approved by it in January 1930. Thereafter, and prior to the decedent's death, the Chilean Government, with the cooperation of the Guggenheim Brothers, was engaged in working out the details necessary to bring about this gigantic merger. A plan was drafted and submitted to the Chilean nitrate producers. During March, April, and May 1930 each of the producing companies presented balance sheets *pro forma*. By the end of June 1930, 90 percent of the producing capacity of Chile, including Anglo-Chilean and Lautaro of Delaware, had been committed to the plan. In July 1930 the Cosach law was enacted. After studying the law the Guggenheim Brothers advised the Chilean Government of certain defects contained therein, and were advised by the Chilean Government that it would find some way later on of making the necessary amendments.

This, briefly stated, was the situation as it existed at the time of the decedent's death. We believe it justifies our finding that it was reasonably foreseeable on September 28, 1930, that Cosach would soon be organized and that what was ultimately done would be done. Faced with these facts, a prospective purchaser of the stock of Anglo-Chilean on that date, would not have been primarily concerned with the future of Anglo-Chilean, as an independent company, but would have attached considerable importance to the effect the organization of Cosach would have upon the value of Anglo-Chilean stock.

The foregoing discussion of the facts and evidence has been limited to a large extent to the history of the Anglo-Chilean nitrate enterprise. It would serve no useful purpose to set forth in detail all of the other evidence contained in the voluminous record. No effort was spared to apprise us of all of the facts necessary to determine the valuation of Anglo-Chilean stock on the critical date. The evidence includes data showing the history of the Chilean nitrate industry; the increase in production, capacity and consumption of competing synthetic and byproduct nitrogenous substances; the cost of Chilean nitrate and competing products; the effect of the Guggenheim process on the Chilean industry, including its cost and efficiency of opera-

tion as compared both to the Shanks process and to the manufacture of competing products; the Chilean labor problem; the inaccessibility of the pampas containing the caliche and the cost of transportation to the consuming countries; the export duties paid and the prospect of their elimination; sales of byproduct iodine; the cost of production and selling prices of Chilean nitrate and competing products; the restrictions on sales and the fixing of prices by the Nitrate Producers Association; the great increase in the consumption of nitrogen products following the World War; the international cartel; the history of Anglo-Chilean, including the deficits sustained; its reports to its stockholders; the assets, liabilities, and earnings of Lautaro, Ltd.; the balance sheets of Anglo-Chilean and its subsidiaries, and of Lautaro of Delaware and Lautaro, Ltd.; the Marsh report; the plan to merge the nitrate producing companies of Chile into one gigantic corporation; the apparent change in the attitude of the Chilean Government in favor of low cost and more efficient Guggenheim process plants, as evidenced by this plan; the ore reserves of Chile; the annual production, capacity for production, and sales of Chilean nitrate; the stocks of Chilean nitrate on hand; the Cosach law; the issuance to the Chilean Government of all of the series A shares of Cosach, and the provision that it, through the directors to be elected by such stock, could veto certain resolutions of the board; the provision for a board of directors composed of twelve members, seven of whom were to be elected by the holders of series B shares; the allotment to the Guggenheim interests of a majority of the series B shares; the undertaking by the Government of Chile to transfer to Cosach Government owned nitrate bearing lands containing 150,-000,000 tons of nitrate; the minimum payments to be made to the Chilean Government by way of dividends and income tax; and the plan to secure additional working capital, funds for the construction of new plants, and funds to take care of the obligations of the constituent companies through the floating of a bond issue.

The fact that some bit of evidence or circumstance deemed by either party to be significant has not been mentioned must not be taken as any indication that it has not been considered; all of the competent evidence has been considered. We have not mentioned the testimony of several witnesses, produced by the parties as experts on valuation; it will now be discussed.

An experienced valuation engineer called by the petitioner expressed the opinion that the Anglo-Chilean stock had no fair market value on the basic date whether it be assumed that the company would continue as an independent operating company or as one of the constituent companies under the Cosach plan. Under the first assumption the witness took the balance sheet of the company (finding

99) and adjusted it to reflect his judgment of sound values. The first adjustment which he made was in the property account. The $43,019,835 shown on the balance sheet for this account represented the total cost of nitrate deposits, lands, railways, moles, harbor facilities and plants aggregating $51,571,643, less depreciation of $8,551,-809. He determined that the sound value of such assets was $12,-800,000, ascertained as follows: Predicting that the total sales of Chilean nitrate in the future would be 2,000,000 tons per year; that Anglo-Chilean's proportion would be 15 percent or 300,000 tons; that the f. a. s. Chile price would be $30 per ton, the cost $25, and the profit $5, he estimated that Anglo-Chilean would have an income from this source of $1,500,000 per annum. He estimated its future sales of iodine would amount to 75,000 kilograms at a profit of $5.30 per kilogram or approximately $300,000 per year and that its profit from other sources would be $100,000 from commercial trading, $912,-000 from the railway and $25,000 from other sources. Reducing the estimated future earnings of all the properties to present worth by using a risk rate of 12 percent to represent the return on investment and 4 percent per year to redeem the investment and applying the general principle of Hoskold's formula, he thus determined the value of $12,800,000.

The witness also determined that the sound value of the Lautaro of Delaware stock owned by Anglo-Chilean was $1,493,304 (approximately 61 cents a share) instead of the $3,362,536 shown on the balance sheet; that the patents and trade marks carried on the balance sheet at $1,049,429 had no value; that the account receivable "Chilean Government Subsidy Claim $1,481,580" should be eliminated from assets; and that other adjustments should be made which collectively resulted in increasing the deficit to $45,000,000. He therefore concluded that there were no assets available for the common stock and that it had no value.

The witness reached the same conclusion, assuming that Anglo-Chilean should become, as it did, a part of Cosach. Some of the factors which he considered in forming this conclusion were the right of the Chilean Government to veto resolutions of the directors, though it owned only 50 percent of the stock; the general condition of the nitrate industry at the time of the decedent's death; the probable difficulty which would be experienced in floating the contemplated bond issue; and the substitution of minimum guarantees to the Chilean Government in lieu of the export duties.

The testimony of the witness is not convincing. The property, which he valued without ever having seen it, had cost the Guggenheims more than $51,000,000, a considerable portion of which had been expended by them only a short time prior to the death of the

decedent. Included in this property was the Maria Elena plant, the cost of which by June 30, 1930, had amounted to $27,827,663. The Coya Norte lands had cost approximately $5,000,000, while the property purchased from the Anglo-Chilean Nitrate & Railway Co., including the railway, waterworks, moles, and plants, had cost more than $14,000,000. The Lautaro of Delaware stock, which the witness valued at 61 cents a share, had a bid and asked price on the London stock exchange of more than ten times that amount, and the Guggenheims, National City Co. and Lehman Brothers in the preceding year had dealt in it on a basis of $9.50 per share. The Chilean Government subsidy claim was perhaps a slow asset and even a questionable one; but the record furnishes little information as to the actual value of the Guggenheim process patents and trade marks. While the witness places no value upon them, the respondent upon brief contends that they had a value of at least $12,000,000. He arrives at this conclusion by assuming that the producers of Chilean nitrate could reasonably have been expected to pay a premium or royalty for the use of the process of at least $1.50 per ton, inasmuch as it would result in a gross profit of $5 per ton. Taking the estimated production of the Chilean producers other than the Maria Elena plant to be 1,200,000 tons per annum and the average life of the patents to be 10 years, he determines the present worth of the patents through the use of the Hoskold formula to be between $12,000,000 and $14,500,000. We do not imply that the patents had any such value; but neither do we find that they had no value, as petitioner's witness concluded. Perhaps the best evidence of the value of these patents would be the price placed upon them by the Guggenheim Brothers and the Chilean Government when the value of the assets of Anglo-Chilean was determined for the purpose of arriving at the amount of Cosach series B shares to be received by Anglo-Chilean; but this price is not disclosed by the record.

We are not impressed by the conclusion reached by this witness that there were no assets available for the capital stock of Anglo-Chilean at the time of decedent's death and therefore it had no value. This conclusion was based upon the deficit disclosed by his "sound" valuation of the assets and upon the deficit shown on the books of Anglo-Chilean. The books of Anglo-Chilean do not attempt to show the value of its assets, and the "sound" values determined by the witness were based on the assumption that Anglo-Chilean would continue as an independent company, subject to the quota restrictions of the Nitrate Producers Association and export taxes imposed by the Chilean Government. In our opinion neither the book values nor the values determined by the witness cast any light on the question of the fair market value of Anglo-Chilean stock.

Assumptions somewhat similar were made by another witness called by petitioner, who valued the nitrate, iodine, and commercial trading properties of Anglo-Chilean at $7,500,000 and the nitrate and iodine properties of Lautaro, Ltd., at $17,000,000, based upon the present worth of what, in his opinion, was the expected annual income from these properties, assuming that Anglo-Chilean would continue as an independent company.

Another witness called by the petitioner as an expert was an investment banker. He expressed the opinion that the market price of 22⅝ did not represent the fair market value of the stock. He based it on the fact that there had been recurring deficits in earnings; declines in the prices of the commodity produced; and that substantial competition was resulting from the synthetic products with a resultant loss in sales and undue increase in inventories. He stated that, as an investment banker, he would have advised a prospective purchaser not to purchase the stock at any price. He knew very little about the nitrate business as such or the contemplated plan of merging all of the Chilean producers. His conclusion that the stock had no fair market value is not entitled to any great weight.

An investment counsellor, called as an expert witness for the respondent, stated that in his opinion 22⅝ represented the fair market value of the stock. He stated that he had made a careful analysis of the "market action" of the Anglo-Chilean and Lautaro securities for the primary purpose of testing the quality of the market to ascertain whether or not it was artificial in any respect and had found nothing to indicate that it was; that he had made studies of the nitrate industry in general, and particularly of Anglo-Chilean, Lautaro, and Cosach; that these studies had disclosed the fact that Anglo-Chilean was a development enterprise which had not in any year of its history operated a completely finished plant; that the Guggenheim process was of major importance to the whole Chilean industry; that the industry appeared to be roughly of the magnitude of a billion dollars a year; that its growth had not been as rapid as the growth of the competing products because its price was higher; that the industry as a whole was growing at a sensational rate; and that in his opinion the outlook was generally favorable.

The witness expressed the opinion that the price at which a stock sells on the market represents its fair market value if the market itself and the transactions are fair; that if there is a reasonable amount of stock outstanding in the hands of people free to sell it, without restrictions, the market is fair in the absence of duress, misinformation, or market manipulation; that this is true although the stock actually dealt in may represent a comparatively small percentage of the total stock outstanding; that the volume of transac-

tions and fairness of market are not necessarily related; and that lack of earning power in a stock does not necessarily indicate either that there is no market for it or that it is devoid of value.

The witnesses possessed the necessary qualifications to enable them to express opinions as to the value of Anglo-Chilean stock on September 28, 1930. All displayed an earnest desire to assist this Board in determining it. Witnesses for the petitioner, however, apparently believed that such value should be determined principally by a consideration of the operations of Anglo-Chilean prior to the decedent's death and its questionable future as an independent company, hampered, as it had been, by quota restrictions imposed by the Nitrate Producers Association, by the export taxes, and by the inability of the Shanks process plants to market their production. They gave little consideration to the effect the execution of the plan to merge the Chilean producers into Cosach would have upon the value of the stock. Respondent's witness, on the other hand, believed that the market quotations were conclusive. The difference in the method by which the witnesses approached the question of the fair market value of the stock explains, at least partially, the wide divergence in their opinions.

The question of the fair market value of the stock on the critical date has been found to be a very difficult one. In discussing a somewhat similar situation, in *Safe Deposit & Trust Co. of Baltimore, Executor, supra,* this Board said:

That there is room for a flexible judgment as to the point at which suppositious willing buyers might agree with this seller, should not paralyze the function of deciding. * * * A reasonable figure must be fixed within the bounds of the evidence, and if it be not arbitrary it is not important that it can not be rationalized beyond every logical objection.

Under the facts in the instant proceeding we believe that $9.40 is a reasonable figure "within the bounds of the evidence." The outlook on September 28, 1930, was not as gloomy as petitioner and her witnesses pictured it; but it was not as bright as the market quotations of 22⅝ would seem to indicate. A purchaser who would have agreed on September 28, 1930, to pay 22⅝ per share, or more than $25,000,000 for the 1,109,859 shares of Anglo-Chilean stock owned by the old firm, would, in our opinion, have been an "incorrigible optimist"; but he would have been unduly pessimistic had he concluded that the stock had no fair market value. We hold that the shares of Anglo-Chilean stock owned by the old firm had a fair market value on the date of the death of the decedent of $9.40 per share.

(b) *Value of $25,325,000 open account loans.*—The next question is the fair market value of the $25,325,000 open account loans made

by the old firm to Anglo-Chilean. Respondent determined that they were worth face value, which is presumptively correct. Petitioner upon brief says: "With conditions as they existed on September 28, 1930, definitely indicating a drop in earnings, and since these loans came at the very tail of the procession, either from the standpoint of earnings which might be expected to be realized on such loans or on the basis of a liquidation or reorganization of the company, certainly such loans were worth nothing like face value." In her reply brief, however, she states that she "feels that valuations predicated upon a finding of no value for the stock and a value of 50¢ on the dollar for the loans would be a very fair and generous basis of settlement of the law suit as toward the government."

Our decision that the stock had some value carries with it an implication that the creditors of the corporation, including the old firm, might reasonably have expected to be paid in full; but, independent of such decision, we would reach the conclusion that the loans were worth face value.

The evidence pertaining to the value of the Anglo-Chilean stock and the open account loans is closely related. Much of it has been heretofore discussed in connection with our valuation of the stock, and no part of the discussion need be repeated. All of the competent evidence has been considered. The evidence introduced by petitioner in support of her contention that the open account loans were worth less than face value is subject to the same criticism made in connection with the valuation of the stock, viz., overemphasis of the prospects of Anglo-Chilean as an independent company and a failure to give adequate consideration to the fact that it was reasonably foreseeable on September 28, 1930, that Cosach would soon be organized and would assume all of the disclosed liabilities of Anglo-Chilean, with the exception of those growing out of the Baburizza transaction. In all of the negotiations preceding the death of the decedent the interested parties treated the loans as being worth face value. No sound reason has been advanced for us to do otherwise. The respondent's determination on this issue, therefore, must be, and it is, sustained.

(c) *Contingent liabilities.*—The remaining issue is the effect upon the decedent's proprietary interest in the firm of certain so-called contingent liabilities on the date of death. They may be divided into three groups: (1) The liabilities of the old firm as such; (2) the liability under the retirement agreement on account of the Harry F. Guggenheim indebtedness; and (3) the estate's commitment under the partnership articles to respond to demands for advances by the firm for firm enterprises in which the decedent had an interest, following action by the firm.

*Group 1—Liabilities of the old firm as such.*—On the date of death, the old firm was the guarantor of the following obligations incurred by Anglo-Chilean:

| | |
|---|---:|
| National City Bank loan, March 31, 1930 | $639, 806 |
| Baburizza notes, June 29, 1929 | 1, 297, 733 |
| Bank loans, 1930 | 2, 000, 000 |
| Sterling credits, 1930 | 3, 423, 336 |
| Dollar credits, 1924 | 4, 800, 000 |
| | 12, 160, 875 |

The guaranties as to the first two items were in writing. After the death of the decedent guaranties as to the other three were reduced to writing.

On the date of decedent's death Anglo-Chilean was primarily liable, and the old firm was secondarily liable, for payment of the loans aggregating $12,160,875. Cosach was formed on March 20, 1931. Its subsidiary Anglo-Chilena assumed the payment of the last three items, bank loans of $2,000,000, sterling credits of $3,423,336, and dollar credits of $4,800,000, but did not assume the payment of the National City Bank loan of $639,806 and Baburizza notes of $1,297,733. They remained the indebtedness of Anglo-Chilean.

The indebtedness of $639,806 represents an amount borrowed from the National City Co. to enable Anglo-Chilean to pay on March 31, 1930, its note to Baburizza due on October 15, 1930. This note, which was increased subsequent to decedent's death to $730,000, was paid off by Anglo-Chilean in the following installments with funds borrowed from the old firm:

| | |
|---|---:|
| November 15, 1932 | $230, 000 |
| March 17, 1933 | 250, 000 |
| May 15, 1933 | 250, 000 |

The indebtedness of $1,297,733 on the Baburizza notes represents that part of the note due on October 15, 1932, namely, £266,666, which Anglo-Chilean paid on that date with $920,000 borrowed from the old firm.

The bank loans of $2,000,000, sterling credits of $3,423,336, and dollar credits of $4,800,000 were ultimately paid by Anglo-Chilena. The old firm loaned Anglo-Chilena the moneys with which to meet these bank loans and dollar and sterling credits. Such advances were made over the period from November 20, 1931, to October 17, 1932, and amounted in the aggregate to $9,288,887.50. The decedent's share of the amounts advanced by the old firm for the purpose of meeting these loans and credits was $2,321,221.87, which amount the petitioner paid to the old firm upon demand.

Petitioner contends that in fixing the value of the decedent's interest in the old firm for the purpose of imposing estate taxes, an

allowance should be made on account of what she designates to be "contingent liabilities" and the actual cash payments made in connection with them.

We can conceive of instances where, in computing the value at date of death of a decedent's interest in a partnership, some reduction in the value of that interest would properly be allowable on account of contingent liabilities of the firm existing on the date of death which it was compelled to pay subsequent thereto; but the facts here presented do not, in our opinion, justify such a reduction. We have no convincing evidence showing that Anglo-Chilean was insolvent and unable to pay its debts either on the date of death or at the time the liabilities, which were not assumed by Anglo-Chilena, became due. When Cosach was formed in March 1931, Anglo-Chilean received 8,318,335 shares of Cosach series B stock, and distributed all of it to its stockholders with the exception of 1,291,335 shares which it retained in its treasury. Its liabilities at that time amounted to approximately $2,500,000. The evidence does not indicate that the value of the 1,291,335 shares retained was not equal to, or in excess of, the amount of the liabilities. Evidence is also lacking that Anglo-Chilena was insolvent at the time the liabilities which it assumed became due. This corporation acquired all of the assets of Anglo-Chilean, and was in a better position than Anglo-Chilean had been prior to the reorganization because it did not assume the $25,325,000 open account loans.

The old firm's liability as guarantor could only arise from the failure or refusal of Anglo-Chilean, and its successor Anglo-Chilena, to pay the loans totaling $12,160,875 when they became due. The parties have stipulated that the old firm loaned money to Anglo-Chilean and Anglo-Chilena, and that these corporations paid the indebtedness. The contingent liability of the old firm as guarantor did not, therefore, ripen into an actual liability. When Anglo-Chilean and Anglo-Chilena paid the amounts due, the contingent liability of the old firm as guarantor was eliminated. The old firm then became a creditor of Anglo-Chilean and Anglo-Chilena, not, as petitioner states in her brief, because it was subrogated to the obligee's rights against these corporations, but because of the loans which it had made to them. In view of the uncertainty as of the date of death that the contingent liability of the old firm as a guarantor would ever ripen into an actual liability, and in view of the fact that it never did become an actual liability of the old firm, we are of the opinion that there is no justification for reducing the value of decedent's interest in the old firm by his proportionate share of what the firm might have been compelled to pay.

*Group 2—Decedent's liability under retirement agreement.*—The next contention of petitioner involves the decedent's liability under the retirement agreement to pay to the members of the old firm or their executors their respective shares of any debit balance charged on the firm's books against Harry F. Guggenheim.

Under the terms of the retirement agreement dated November 28, 1923, it was agreed that upon the termination and liquidation of the partnership ventures, each of the retiring partners, Harry F. and Edmond A. Guggenheim, was to be credited with his share of the final profits or charged with his share of the final losses resulting from the ventures in which he had an interest. The losses from unprofitable ventures, if any, were to be set off against the profits of profitable ventures, until all were finally liquidated and terminated. At that time, if there remained any profits, each was to be entitled to his respective share thereof. On the other hand, if a net loss existed and the books showed a final debit balance against Harry F. Guggenheim, then the decedent was obligated to pay on demand to the remaining partners or their executors, their respective shares on account of the debit balance thus shown against Harry. Murry Guggenheim had obligated himself to make a similar payment in the event of a debit balance against Edmond.

As of the date of the decedent's death the advances which had been made by the three remaining partners and the estate of Isaac Guggenheim for the account of Harry F. Guggenheim, and which were charged against this account on the firm books, were as follows:

| | |
|---|---|
| Non nitrate enterprises | $1,213,779.48 |
| Anglo-Chilean enterprise | 2,180,482.50 |
| | 3,394,261.98 |

These advances were secured by the following collateral representing Harry's interest in the old firm: (a) 12½ percent of the Anglo-Chilean stock held by the firm; (b) 11.48 percent of the Anglo-Chilean open account loans; and (c) other assets of a stipulated value of $438,590.42. Assuming, as we have found, that the value of the Anglo-Chilean stock was $9.40 per share and that the loans were worth their face value, the value of Harry's collateral was more than four and one-half million dollars.

It is apparent that any liability of the decedent under the terms of the retirement agreement will not arise until the termination and liquidation of each of the partnership ventures in which the retiring partners have an interest. Even upon the termination and winding up of such ventures the decedent will not be liable unless a final debit balance is shown to exist at that time against Harry. It is entirely possible that Harry's share of the profits from profitable ventures will exceed his share of any losses from unprofitable ventures plus any

debit balance resulting from advances made in his behalf by the remaining partners and executors, in which event no liability will attach to the decedent, or to his estate.

The advances made by the three remaining partners and the estate of Isaac Guggenheim for Harry F. Guggenheim increased from a total of $3,394,261.98 at the date of the decedent's death to $5,426,803.67 as of December 31, 1935. On November 24, 1936, petitioner effected a settlement with Murry Guggenheim. He paid the estate $27,000 in cash, and the obligation of the estate to him, on account of advances made by him on behalf of Harry, amounting to $1,716,842.53, was canceled in consideration of the cancellation of his obligation to the estate on account of the advances made by the decedent or his estate on behalf of Edmond, totaling $1,748,587.95. The agreement of settlement provided for the assignment by Murry to petitioner of "all of his claims against and rights with respect to the assets in the Harry F. Guggenheim account and the rights and property represented by said account." Petitioner made a similar assignment of all of the estate's claims against the Edmond A. Guggenheim account.

Under date of May 11, 1937, petitioner entered into an agreement with Simon Guggenheim to pay him $1,774,681.57, representing the full amount of his participation in the Harry F. Guggenheim account as of January 1, 1937, with an adjustment for interest. In this agreement Simon assigned to petitioner his entire right, title, and interest in the Harry F. Guggenheim account.

A similar agreement was entered into between petitioner and the estate of Isaac Guggenheim on August 2, 1937, providing for the payment of $363,076.38 to that estate, representing its share in the principal of the debit balance against the Harry F. Guggenheim account, with an adjustment for interest. This agreement also provided for the assignment to petitioner by the estate of Isaac Guggenheim of all of its right, title, and interest in the Harry F. Guggenheim account.

Petitioner has not entered into any agreement with S. R. Guggenheim relative to his participation in the Harry F. Guggenheim account and under date of December 8, 1937, she was advised by attorneys for S. R. Guggenheim that he claimed a lien on any and all funds or credits accruing to Harry F. Guggenheim or to the estate of the decedent because of their interests in enterprises of the firm, in order to protect him in the event of a deficiency in the account.

Calling our attention to the contents of the above mentioned documents, petitioner upon brief states: "There could not be a clearer demonstration of the fact that the obligations of the decedent under the Retirement Agreement to the other partners of the Old Firm constituted a claim against the decedent's interest in the firm." She argues, therefore, that the retirement agreement liability "should be treated

as a Firm liability, for whatever the interest of the decedent may be in the Firm, it is perfectly clear that the petitioner, as his Executor, can never realize on such interest until she has met and satisfied the decedent's liability under the Retirement Agreement on account of Harry's indebtedness." She urges that at least 50 percent of the decedent's liability on account of the Harry indebtedness existing on the date of death should be allowed as a deduction in computing the value of decedent's interest in the old firm.

We agree with petitioner that an intelligent and reasonable buyer and seller of an interest in the partnership as of September 28, 1930, would have considered any liabilities attaching to such an interest on that date. They would probably have reduced its value by the amount of any actual and fixed liabilities then in existence. The amount of any reduction because of contingent liabilities would have depended, however, on the probability that they would at a later date result in a fixed liability which the prospective purchaser would have to pay.

The liability here involved was only to arise in the event that, upon the termination and liquidation of the ventures in which Harry Guggenheim had an interest, his share of the losses from such ventures, plus any debit for advances made in his behalf by the partners, should be in excess of his share of the profits from such ventures. The evidence indicates that at the date of death the advances made on behalf of Harry were amply secured. He had an interest in the stock of Anglo-Chilean and the open account loans which, as we heretofore pointed out, had a value of approximately $4,500,000. In addition, as we have indicated elsewhere in this opinion, it was readily foreseeable that Anglo-Chilean would receive over 8,000,000 shares of Cosach B stock and that the payment of substantially all of the open account loans would be assumed under the plan then being considered. Under such circumstances we must disagree with petitioner's contention that there was a "lack of any real value in the enterprises in which Harry was interested * * *." In our opinion a prospective purchaser of the decedent's interest in the old firm would not have asked, and a prospective seller would not have given, any deduction from the value of his interest because of his contingent liability under the retirement agreement.

Petitioner lays great stress upon the settlements made with the partners of the old firm subsequent to decedent's death for advances made in behalf of Harry. As pointed out, the decedent's liability under the retirement agreement was not to attach until it was disclosed, upon the termination or liquidation of the enterprises in which Harry had an interest, that the collateral and profits from those enterprises were not sufficient to take care of the losses and advances. We are unable to determine why petitioner decided to pay the part-

ners for their advances prior to the termination or liquidation of the enterprises in which Harry had an interest. A letter from the attorneys for S. R. Guggenheim to the Guggenheim Brothers dated December 8, 1937, possibly throws some light upon it. In that letter, after pointing out that certain advances had been made by S. R. in behalf of Harry in accordance with the terms of the retirement agreement, and that there were then on hand, and in the future there would probably accrue, certain funds from the Anglo-Chilean enterprise upon the participation interests of Harry and the decedent, it was stated:

This is to notify you that our client claims a lien on any and all such funds or credits in whatever form the same may be, and that we, on his behalf, object to the impairment of the lien and security for his said advances which would result from turning over of any part of such funds either to Mr. Harry Guggenheim or to the estate of Daniel Guggenheim. It seems obvious that a payment of such funds to the Estate of Daniel Guggenheim, followed by the probable distribution thereof by it to other parties, as we understand has been done in the past despite full notice of our client's claim, would leave our client unprotected, and would relegate him for the probable deficiency to the responsibility of an Estate whose resources and ability, present or future, to discharge this and other large debts, are not known to him.

From this letter it appears that S. R. Guggenheim felt that payments of partnership funds by the old firm to the estate of the decedent were objectionable because the distribution of such funds to the beneficiaries of the estate would leave him unprotected in the event that there was a final debit balance in the Harry F. Guggenheim account.

The evidence does not show why petitioner made settlements with the partners other than S. R.; but it is not unreasonable to assume that she did so because they entertained fears similar to those expressed in the letter. However that may be, it is to be noted that in each instance where a settlement was made petitioner took an assignment of the partner's right, title, and interest in the Harry F. Guggenheim account. But the payment of these advances by petitioner did not fix the amount of decedent's liability under the retirement agreement. That can only be definitely determined upon the termination or liquidation of the ventures in which Harry had an interest. If at that time the profits from such ventures exceed the amount of the advances, petitioner has the same claim against such profits as the partners who were reimbursed by her would have had if they had awaited that event.

We have not overlooked petitioner's contention that, inasmuch as the Commissioner included decedent's share of the debit balance in the Edmond A. Guggenheim account, totaling $1,071,495.20, as part of the value of his interest in the old firm on the date of death, then Murry Guggenheim's share of the indebtedness of the Harry F.

Guggenheim account should therefore be eliminated either in valuing the decedent's interest in the old firm or in computing the value of the gross estate. This contention is not sound. The amount of the decedent's advances to the Edmond A. Guggenheim account represented an account receivable to him during his lifetime and to his estate after his death. The ultimate payment of these advances was amply secured, first, by the possibility that profits accruing to the account would be sufficient to repay the amount of decedent's advances; and, second, by the guarantee of Murry Guggenheim that in the event they were not, he would make good the deficiency. Under these circumstances respondent did not err in adding to the value of the decedent's interest in the old firm the amount advanced by him for the account of Edmond. It does not follow, however, that the amount advanced by Murry on behalf of Harry should be eliminated, either in valuing the decedent's interest in the old firm or in computing the value of decedent's gross estate. As heretofore pointed out, the decedent's liability for the advances by the other partners was contingent upon there being a final debit balance in Harry's account upon the termination and liquidation of all the enterprises in which Harry had an interest. The amount, if any, that decedent or his estate would have to pay was uncertain on the date of death and has not as yet been ascertained. In order to justify the claimed deduction, either in computing the value of decedent's interest in the old firm or in computing the value of the gross estate, the burden was on petitioner to prove that on the date of death it was reasonably foreseeable that the contingent liability then existing would eventually ripen into a fixed liability and also to show the amount which she would be required to pay. She has not sustained this burden.

*Group 3—Liabilities arising under partnership articles.*—The petitioner's next contention is that some allowance should be made in fixing the value of the decedent's interest in the old firm on account of the estate's commitment under the partnership articles to respond to demands for advances by the firm for firm enterprises in which the estate had an interest.

Under the firm agreement of June 26, 1925, which was in effect when the decedent died and to which decedent was a party, it was provided:

[This agreement] shall bind an ex-partner as to all monies which the firm may request for outlays and expenditures made in connection with enterprises in respect of which such ex-partner has obligations and rights as above defined in this clause, and in connection with losses directly assignable to such enterprises.

The agreement also provided, in the event a partner or ex-partner:

* * * shall fail, after 30 days notice in writing, to make any advance which by this Article he is obligated to make, the firm shall have from time to

time during the continuance of such default the recurring option, in addition to its other rights, either to compel such advances, or to terminate all further rights of such partner or ex-partner * * * and any determination made by the firm in the premises shall be final and conclusive upon such partner or ex-partner.

The will of the decedent contained the following provision with reference to the partnership agreements:

I hereby ratify and confirm all such articles of copartnership and such other agreements and undertakings as the same shall exist at the time of my death, and I direct my Executrix to perform and carry into effect all the provisions affecting my estate contained in any such articles of copartnership, agreements and undertakings.

Subsequent to the decedent's death his estate paid to the old firm $5,211,571 in response to demands made by it. Of this amount, $419,000 represented the decedent's share of the $1,676,000 loaned by the old firm to Anglo-Chilean in 1932 and 1933 to pay its obligations of $730,000 to the National City Bank and the balance due on the last Baburizza note of $920,000. Of said amount, $2,321,221 represented petitioner's share of loans made by the old firm to Anglo-Chilena during 1931 and 1932, totaling $9,288,887. Anglo-Chilena used these funds to pay the bank loans, dollar credits, and sterling credits which it had assumed when it took over the assets of Anglo-Chilean. Of said amount, $1,721,250 represented petitioner's share of the amount paid by the old firm for $10,000,000 face value Cosach bonds, which it purchased at 90 under the circumstances set out in our findings. Seven hundred and fifty thousand dollars represented petitioner's share of a loan of $3,000,000 made by the old firm to Cosach through Anglo-Chilean in December 1931.

It is apparent from the foregoing that the entire amount of $5,211,471 was used by the old firm for the purpose of making loans either to Anglo-Chilean, Anglo-Chilena, or Cosach through Anglo-Chilean, or for the purpose of purchasing Cosach bonds. While it is true that the decedent during his lifetime committed himself and his estate to make advances for firm outlays or expenditures, and for losses incurred in connection with enterprises in which he had an interest, there is no way that we can measure, as of the date of the decedent's death, the effect upon the value of his interest in the old firm of his promise to make such advances. In so far as the decedent's promise involved the possible payment of losses incurred in firm enterprises is concerned, it may be that such possibility would have had a depressing effect upon the value of his interest in the old firm as of the date of death. However, it is possible that no losses will be incurred, and that his promise to make advances to the firm will result in increasing the value of his interest in the partnership because of the partnership's investment of money advanced in profitable undertakings. The burden was on petitioner to prove that the

decedent's commitment to make advances in response to the demands of the partnership not only decreased the value of his interest in the old firm as of the date of death, but also to show the amount of such decrease. She has not sustained this burden merely by proving that after his death his estate made advances which were used by the partnership in making loans to corporations which, in the absence of convincing evidence to the contrary, we must assume were solvent, and in purchasing bonds of Cosach.

## II.—Value of Decedent's Interest in New Firm.

The next issue involves the value of the decedent's interest in Guggenheim Brothers "New Firm."

The new firm of Guggenheim Brothers was created on June 26, 1925. The partners were Daniel, Morris, S. R., and Simon Guggenheim, J. K. MacGowan, and E. A. Cappelen Smith. The term fixed expired on January 1, 1930. By an agreement dated November 25, 1929, the new firm was extended from January 1, 1930, to January 1, 1935, S. W. Howland replacing J. K. MacGowan as a partner, the latter having retired.

The agreement extending the new firm, which was executed by the decedent, provided that if the amounts which Smith and Howland were entitled to receive out of the firm profits on the basis of their percentages should not equal $150,000 each in any one year, they nevertheless would receive $150,000 each, and in the event the firm profits were not sufficient to meet these guaranteed minimum payments, "the Guggenheims, in equal shares, shall contribute the amount of such deficiency to the firm for this purpose." The agreement also provided that Howland's interest in Anglo-Chilean was to be 50,000 shares, which were to be placed immediately to his credit. In case Howland should die or become unable to perform his duties during 1930, his interest in the firm was to vest in the four Guggenheims, who were required to pay him or his estate $400,000. In the event of Howland's death or disability during the years 1931, 1932, 1933, or 1934, the amount to be paid him was to be increased by $400,000 each year, and at the end of the partnership term, i. e., January 1, 1935, Howland, at his election, had the right to require the four Guggenheims to purchase his entire interest in the firm and to pay him therefor $2,000,000. The agreement further provided that if any one of the four Guggenheims should cease to be a partner before the settlement with Howland was effected, he or his estate should not be required to participate in the full settlement but should be liable for only a proportionate part, depending upon the date of death or retirement.

Howland remained a partner throughout the term, and on the expiration of the partnership on January 1, 1935, he elected to, and did,

sell his interest. Pursuant to the terms of the partnership agreement, the remaining three Guggenheim partners and the estate of the decedent paid Howland for his interest $2,000,000. The share of the decedent's estate in this payment was $100,000, or three-sixtieths of the total amount. Petitioner paid this amount and received three-sixtieths of Howland's interest in the new firm.

The Commissioner in his notice of deficiency valued the decedent's interest in the new firm, as of the date of death, at $167,288.60. In making this determination he made no allowance for any liability of the decedent's estate to the new firm because of the provision in the agreement for the payment to Howland in the event he decided to sell his interest to the partnership. Petitioner contends that the respondent erred in failing to recognize the existence on the date of death of such liability, which had to be met after the decedent's death by a cash payment out of the estate, and that its existence depressed or reduced the value of the decedent's interest in the new firm. She further contends that, in view of the payment of $100,000, the decedent's interest in the new firm was worth not more than $67,288.50 at the date of death.

We are unable to agree with this contention. In order to hold that the existence of the agreement depressed or reduced the value of decedent's interest in the new firm as of the date of his death, it would have to appear that the agreement imposed upon petitioner an obligation to pay out money without getting an equivalent return. The stipulated facts, however, do not show that Howland's interest was worth less than the partnership agreed to pay, and eventually did pay, for it, and we can not assume that it was. Under such circumstances, it can not be said that the agreement to purchase Howland's interest, and the agreement of the decedent to pay his proportionate part of the purchase price, depressed the value of the decedent's interest in the new firm. This issue must, therefore, be decided in favor of the respondent.

### III.—Deductions by Reason of Payments Required under Partnership Agreements.

In the petition it is stated that in addition to the items previously mentioned therein and which we have heretofore discussed, "petitioner asserts as deductions" certain others. She says that they should more properly be considered in connection with the valuation of the decedent's interest in the partnership, and, if allowed in that connection, that only the net liability resulting from the decedent's interests in said partnership may be allowed as a deduction from the estate. This conclusion of the pleader seems to be correct; and even though the questions are not separately discussed upon brief, we think that they merit some consideration.

The first item apparently refers to the payments totaling $5,211,471 made by the decedent's estate to the old firm in response to demands made by the firm, and heretofore discussed under the heading of "Group 3—Liabilities Arising under Partnership Articles", in connection with the valuation of decedent's interest in the old firm. As there pointed out, the amount advanced by petitioner to the old firm subsequent to the decedent's death was used by it for the purpose of making loans either to Anglo-Chilean, Anglo-Chilena, or Cosach through Anglo-Chilean, or for the purpose of purchasing Cosach bonds. The fact that decedent prior to his death, and his estate thereafter, were obligated to make such advances, and that they were made by his estate, does not entitle the estate to any deduction unless the payments resulted in decreasing the value of the decedent's gross estate. The payments in question did not represent the decedent's share of losses sustained by the old firm, but were made in order that the old firm could make certain loans or investments in corporations which we must assume were solvent in the absence of convincing evidence to the contrary. In making such payments the estate merely took money from one pocket and placed it in another. Under such circumstances no deduction can be allowed in computing the net estate of the decedent.

The next item relates to the liability of the decedent for the payment of the indebtedness account of Harry F. Guggenheim. It has been discussed at length in connection with the valuation of decedent's interest in the old firm. It was there pointed out that there was no matured liability on the part of the estate at the date of the decedent's death and that the petitioner has not shown the amount, if any, which she may eventually have to pay because of the decedent's agreement to pay any final debit balance existing in the Harry F. Guggenheim account upon the termination and liquidation of the partnership ventures in which Harry had an interest. Although petitioner has cited many cases in her brief wherein the courts and this Board have allowed deductions from the value of the gross estate of contingent claims arising from commercial transactions when the amounts of the claims became fixed subsequent to a decedent's death (*Commissioner* v. *Kelly's Estate*, 84 Fed. (2d) 958; *Stewart* v. *Commissioner*, 49 Fed. (2d) 987; *Percy B. Eckhart, Executor*, 33 B. T. A. 426; petition for review dismissed, 91 Fed. (2d) 1010), no case has been cited, and we know of none, allowing a deduction for a contingent liability existing at the date of death which has not ripened into, and which may never ripen into, an actual liability. Article 29 of Regulations 70 provides that "An item may be entered on the return for deduction though the exact amount thereof is not then known, provided it is ascertainable with reason-

able certainty, and will be paid. No deduction may be taken upon the basis of a vague or uncertain estimate." The amount which the decedent's estate may eventually pay because of his promise to pay any final debit balance in the Harry F. Guggenheim account is not ascertainable with reasonable certainty and we are of the opinion that the respondent did not err in disallowing the claimed deduction.

The third item is the $100,000 paid by petitioner in connection with the acquisition of Howland's interest in the new firm. The facts with reference to such purchase and the guaranty in the new firm partnership agreement of a minimum income of $150,000 per year to S. W. Howland and E. A. Cappelen Smith have heretofore been set forth in connection with the valuation of decedent's interest in the new firm. It is impossible to determine from the evidence whether the agreement to purchase Howland's interest for $2,000,000 was an asset or liability; nor can it be determined whether the estate gained or lost when, in accordance with the agreement, it advanced $100,000 as its share of the purchase price of Howland's interest. In the absence of evidence that the payment of this amount decreased the value of the gross estate of the decedent, the deduction may not be allowed.

Petitioner's allegation that she is entitled to a deduction of at least $45,690 because of decedent's liability under the guaranty of minimum income to S. W. Howland and E. A. Cappelen Smith must also be disallowed. Liability was to attach to the Guggenheims only in the event that the profits of the new firm were insufficient to meet the guaranteed minimum payments. The evidence does not disclose that the income of the new firm was so low it ever became necessary to call upon either the decedent or his estate. The petition was filed prior to the purchase of Howland's interest in the new firm and the present issue is probably now moot. In any event there is no evidence justifying the deduction of the amount referred to in the petition.

### IV.—Value of Anglo-Chilean Stock Owned by Decedent.

The issue concerning the value of the 1,720 shares of the common stock of Anglo-Chilean owned by the decedent at the date of his death has been determined by our finding that the stock had a fair market value of $9.40 per share. The reasons for such finding are set out in the portion of our opinion bearing upon the value of the stock owned by the old firm.

### V.—Special Deposit of $79,900.

The next question is whether or not the so-called "special deposit" of $79,900 constitutes a part of the assets to be included in the dece-

dent's estate. The facts with reference to this issue, though not shown in our findings, have all been stipulated.

Prior to December 1922 the old firm, in which the decedent and Harry F. Guggenheim were at that time partners, acquired certain shares of common and preferred stock of the Sherman Oil Co. as a firm enterprise. During December 1922 the firm allocated to each of its partners, including Harry, their respective participations in such common and preferred stock and charged their accounts accordingly. The stock, however, was not delivered to the partners at that time. In December 1922 Harry sold the rights which had been allotted to him in the preferred and common stock of the Sherman Oil Co. to the decedent for $83,000, which sum Harry thereupon paid to the old firm in reduction of the indebtedness charged against him upon its books. On February 6, 1923, the old firm delivered to Harry 1,860 shares of preferred stock and 1,395 shares of common stock, representing his participation, and requested that he endorse the stock in blank and redeliver it to the firm to be held as security for the payment of the indebtedness then charged against him on the firm's books. Instead of delivering the stock to the firm, however, Harry delivered it to the decedent. On February 27, 1923, the decedent, upon the request of the firm, surrendered the Sherman Oil stock which he had purchased from Harry and turned it over to the firm to be held by it as collateral against Harry's debit balance with the firm. On February 28, 1923, Harry withdrew as a partner and the various questions between him and the other members of the firm were thereafter settled by the agreement dated November 28, 1923, known as the retirement agreement. After the execution of such agreement the firm continued to hold the above stock as collateral for the indebtedness charged against Harry on its books under the terms of the retirement agreement. During 1929 the Sherman Oil Co. redeemed a part of its preferred stock and the decedent received from it a total of $79,900, representing the proceeds from the redemption at par of 799 shares of preferred stock, being a part of the preferred stock purchased by him from Harry. As the stock so redeemed was at that time held by the old firm, upon its request the decedent turned over to it his check for $79,900, to make good the depreciated value of the collateral held by the firm to secure Harry's account. The firm credited the proceeds of the check upon the indebtedness charged against Harry on its books.

The amount of Harry's indebtedness on the books of the firm at the date of decedent's death was $1,525,308.01, after the old firm had credited against such indebtedness the sums of $83,000 and $79,900. In the Federal estate tax return filed by the petitioner this item of $79,900, which was carried on the books of the decedent as "Guggenheim Brothers Special Account", was included in the return as an

asset of the decedent's estate. In the notice of deficiency, the Commissioner included the $79,900 in the gross estate of the decedent and made no increase in the amount of the decedent's indebtedness in connection with Harry's account.

Petitioner contends that respondent erred in including the $79,900 in the decedent's gross estate. The basis of her contention is set forth in her brief as follows:

* * * The decedent was obligated to the firm individually to pay any final debit balance charged against Harry F. Guggenheim, and since the $79,900 in reality represented collateral loaned to secure the account, which the decedent himself ultimately was liable to pay, the decedent under no circumstances could ever retrieve or had any right to the $79,900 unless the profits inuring to Harry F. Guggenheim on account of firm enterprises in which he continued to have a participation exceeded the indebtedness charged against his account. On the date of death, this net debit balance amounted to over $4,400,000, with no prospect of any future reduction in any substantial amount by future profits attributable to Harry's account. Accordingly, the item of $79,900 did not represent anything of value to the decedent on the date of death, and should be excluded in computing his gross estate.

It is apparent that petitioner's contention is based on the assumption that it was foreseeable on the date of death that the profits inuring to Harry on account of firm enterprises in which he continued to have a participation would not equal the amount of any debit balance existing at the time of the final determination or liquidation of these enterprises, and that therefore the decedent could never expect to reacquire the $79,900 deposited as collateral.

We have already pointed out in connection with our discussion of the liability of the decedent under the retirement agreement (group 2, subdivision (c), issue I) that it was not known at the date of death, or even at the time of the hearing, whether the decedent's estate would, or would not, have to make any payments in connection with his guarantee of any final debit balance in Harry's account. Even though there was a substantial debit balance in the account at the date of the decedent's death, as pointed out in the discussion referred to, it was secured by collateral, in addition to the $79,900, having a value of more than four and one-half million dollars. Obviously, if such collateral is sufficient to take care of the final debit balance, the $79,900 will not be required for that purpose.

It can not be presumed, in the absence of any evidence showing it to be a fact, that there will be a final debit balance in the account when all of the enterprises in which Harry has an interest are terminated. Petitioner's contention that the item did not represent anything of value to the decedent on the date of death can not be sustained. The $79,900 was properly included by the respondent in decedent's gross estate.

### VI.—*Inclusion in Gross Estate of Corpus of Trust.*

We find the facts pertaining to this issue to be as stipulated. For the purposes of this discussion they may be summarized as follows:

Under date of October 29, 1917, the decedent created a trust for the benefit of his son, Meyer Robert Guggenheim, and the child or children of the latter. The original trust agreement of October 29, 1917, carried a power of revocation "in whole or in part." It was revoked and wholly "Superseded and cancelled" by an agreement dated May 28, 1918.

On the date of decedent's death the agreement executed on May 28, 1918, was in effect as modified and amended by an agreement dated February 14, 1922, and as modified in a minor particular, by the agreement of February 4, 1925. The two material agreements are those of May 18, 1918, and February 14, 1922.

At the time of his death on September 28, 1930, the settlor, Daniel Guggenheim, left surviving him a son, M. Robert Guggenheim (hereinafter referred to as Robert), and M. R. Cordova Guggenheim (hereinafter referred to as Cordova), the only surviving issue of Robert. At the time of the settlor's death, Robert was 45 years old and his son Cordova was 20 years old. Robert had been married three times. He first married Grace Burnheimer in 1905. A child of this marriage, Daniel Guggenheim, 2nd, was born in 1906 but died in 1925. Cordova, the second child of this marriage, was born in 1910. In 1915 Robert was divorced from his first wife, and during the same year married Margaret Weylin. They were divorced in 1928 and in the same year Robert married his third wife, Elizabeth Eaton. (While it was stipulated that she was "his present wife", the briefs indicate that they have since been divorced and that Robert has been married for the fourth time. This, however, is not material to the present issue.) Robert had no children by either his second or third marriage.

The agreement of May 28, 1918 (dated as of October 29, 1917) was executed by the decedent (the settlor) and a trust company and an individual, as trustees. By this agreement, the trustees were authorized to invest the trust corpus, collect the income therefrom, and pay it over to the son of the settlor, Robert, called the "Beneficiary", to the extent of $21,000 per year for 10 years from the creation of the trust or until its earlier termination. The remainder of the trust income was to be added to corpus, unless the settlor directed that it be paid to the "Beneficiary"; but the settlor retained the right to reduce the payments at any time to $21,000 a year.

Upon the expiration of the 10-year period, if the trust had not been revoked prior thereto, the trust was to terminate absolutely and the trustees were to pay over the corpus to the "Beneficiary" free of

all restrictions; but if the "Beneficiary" died prior to the expiration of the 10-year period, the trust was to be continued for 20 years, during which time the trustees were to pay over the income for the maintenance and education of the child or children surviving the "Beneficiary" until any child or children reached 21 years of age, whereupon the trust income was to go to such child or children until 20 years from the date of their father's death, at which time the trust corpus and all accumulations were to be divided equally among the children. The document contained the following description of the term "child" and "children":

The term "child" or "children" as used in this paragraph numbered Third in referring to a child, or to children, of the Beneficiary him surviving, shall be taken and held to mean offspring of the Beneficiary, born in lawful wedlock, whether as the fruit of the first or second marriage of the Beneficiary, and whether the parents of any such child or children have or have not been divorced; and any one such child shall have the same rights hereunder, and the same interest in the trust fund, as any other such child, and no other or greater rights or interests.

In the event the beneficiary died prior to the expiration of the 10-year period, leaving no children, the trust corpus and all accumulations were to revert to the settlor, his executors, or administrators.

The trust instrument also contained the following provisions:

FOURTH: The settlor hereby expressly reserves to himself the privilege of increasing the principal of the trust fund, from time to time, by adding thereto other properties, interests and securities. Any such added properties, interests and securities the Trustee shall receive, hold, manage, sell, exchange, invest and reinvest, deal with and dispose of in the same manner as herein specified in respect of the properties, interests and securities forming the original trust fund.

FIFTH: The trust fund created hereby shall comprise the properties, interests and securities hereinbefore described in their present form, or in any substituted form resulting from the sale or exchange of the same, or otherwise, and also such additional or other properties, interests or securities as may from time to time be added to the trust fund by the Settlor, or substituted by the Settlor for properties or securities previously comprised in the trust fund, or as may from time to time be acquired in the trust fund, or as may from time to time be acquired by the Trustees through investments or reinvestments for the trust fund made in the manner herein provided, of the proceeds of any sales of trust property, or of the income of the trust fund or any part of such income or of any other monies belonging, pertaining or devoted to the uses of the trust.

The settlor reserved the power to "modify or alter in any way or revoke in whole or in part this agreement and the trust then existing, and the estates and interests in property hereby created and provided for * * *." The agreement provided, however, that:

* * * no power of revocation in this agreement reserved or contained shall apply to the income at any time received or accrued upon the trust fund, or upon the properties, interests or securities originally or at any time comprised therein, or apply to any accumulations or investments of such income; but the

legal ownership and title of the Trustees and the beneficial ownership and title of the Beneficiary, or beneficiaries, in and to such income shall be and remain absolute and indefeasible, subject only to such directions as the Settlor may give to the Trustees under the powers herein reserved or contained as to the respective proportions of income to be paid over or accumulated, or as to the investment or reinvestment of accumulations, or varying the respective shares of the beneficiaries to be paid over or accumulated or advancing or changing the time of payment to the Beneficiary, or beneficiaries; but in the event of the revocation of this agreement in respect to the principal or corpus of the trust, the income of the trust fund then in the hands of the Trustees and not theretofore distributed or disbursed by them, together with all accumulations or investments of such income, shall be paid over to the Beneficiary, or beneficiaries, for whose use and benefit the said trust fund would then be held by the Trustees but for such revocation.

On February 14, 1922, the decedent amended the trust agreement then in effect. After reciting the prior agreement and dispensing with the individual trustee, due to his death, the purposes of the new agreement were stated as follows:

WHEREAS, the Settlor desires: (a) to modify and alter the terms and provisions of the said trust agreement and the terms and conditions of the said trust so created thereunder in certain particulars as hereinafter set out relative to the accumulation or payment of income and the distribution of principal; and (b) to relinquish and divest himself of certain rights and powers reserved or retained by him of directing or controlling the administration of the said trust and the management of the trust fund, and to confer such rights and powers upon and to vest the same in other persons, and (c) to relinquish and divest himself of the right or power reserved to or retained by him of revoking the said agreement and the trust existing thereunder; * * *

Under this amendatory agreement, the trustee was directed to pay the income of the trust to the extent of $21,000 a year to Robert "for and during his natural life", and to add the remainder of such income to the corpus of the trust. The settlor reserved the right to increase the amount of the payments to Robert to an amount not in excess of the income and to decrease such payments "down to no amount of payment at all." The agreement provided that "if, at the time when any installment of income is payable to any beneficiary hereunder, the income of the trust fund in the hands of the Trustee is insufficient to permit payment to the Beneficiary of an installment at the annual rate of payment then fixed", the trustee was to make up any deficiency out of capital items. It also contained the following provision:

* * * Any and all income of the trust fund, and any and all receipts of sums of money or other cash disbursements in the nature of return of capital or distribution of assets at any time received by the Trustee in excess of the amount thereof paid or payable to a beneficiary hereunder, notwithstanding that such income or receipts may have been invested in property or securities or otherwise added to or incorporated in the trust fund, shall if and whenever

the Settlor shall so direct in writing, and as to the whole or any part of such excess income or receipts, or as to the whole or any part of the property or securities in which the same may have been invested, likewise be paid and delivered to any beneficiary hereunder as a further distribution to such beneficiary in addition to any payments which may have been made at a regular annual rate.

Upon the death of Robert, the trustee was to pay over for the benefit of the child or children of the "Beneficiary" an amount out of income sufficient to provide for the maintenance and support of such child or children until each child reached 21. Thereafter the full portion of such income was to be paid over to each child until the expiration of 20 years following the death of the "Beneficiary." At the expiration of such 20 years, the corpus was to be divided into as many equal parts as there were children of Robert surviving him at the time of his death, and each portion of the corpus was to be paid to such child or children then living or to the estates of those who had died, and the trust was to terminate. In the event Robert should die leaving no child, or descendants of a child, then the trust fund was to revert to the settlor or to his executors or administrators. The amendatory instrument defined the terms "child" or "children" in the same language used in the earlier instrument.

Decedent relinquished his right to direct or control the administration of the trust and the management of the trust fund and named his three brothers to have and exercise the rights and powers originally reserved to himself in that respect. The agreement provided that the rights and powers so transferred should include the power of increasing or decreasing the amount of the annual payments to be made to Robert. It also provided that the settlor relinquished, abandoned and divested himself of all of the powers reserved to or retained by him in the trust agreement of October 29, 1917, to revoke the trust agreement and the trust existing thereunder. It further provided as follows:

Nothing in this instrument contained shall be deemed to affect or limit the power of the Settlor to modify, alter or correct the provisions of the said trust agreement of the 29th day of October, 1917, provided that any such modification, alteration or correction shall not operate to revoke the said agreement or the trust existing thereunder, or to frustrate the essential purposes of the trust of making provisions for the son of the Settlor and his children or descendants, or to impair the substantial integrity of the trust fund, or to create a beneficial interest in or under the trust, on behalf of the Settlor or any person not previously beneficially interested therein or thereunder. * * * Nor shall anything in this instrument contained be deemed to affect or limit the power of the Settlor, by directions in writing given to the Trustee, to alter, define and prescribe the relative interests of the beneficiaries in the trust fund or the income thereof, their respective shares in the same, their respective powers with respect to such shares, and the time and manner of making distribution to the beneficiaries, or any of them, by way of advancement, postponement or otherwise,

of principal or income, or both, of the trust fund; which power of the Settlor is hereby expressly reaffirmed and reserved, together with the power of causing a final distribution to be made at any time to or among the beneficiaries, or any of them, and so terminating the trust.

The power to alter, as quoted above, was also contained in the agreement of February 4, 1925, wherein the trust agreement was further amended in certain respects not here material. The entire income of the trust was paid to Robert during the life of the decedent.

The value at the time of the decedent's death of the securities delivered to the trustee on May 28, 1918, at the time of the execution of the revocable trust, was $990,609, taking all of the securities which were redeemed at the amount received by the trustee and giving effect to stock dividends and stock rights. The value, at the time of the decedent's death, of the property in the hands of the trustee on February 14, 1922, when the decedent relinquished the power of revocation was $996,588.89, after giving effect to redemptions, stock dividends, and stock rights. In his notice of deficiency the Commissioner determined that the value at the time of the decedent's death of the securities held by the trustees (including 75 shares of the Anglo-Chilean common stock) was $2,301,462.99. He included this amount in the gross estate on the ground that the transfers in trust came within the provisions of section 302 (d) of the Revenue Act of 1926. The parties have stipulated that the value of the trust corpus at the time of the decedent's death, exclusive of the Anglo-Chilean stock, was $2,289,450.62. The value of the Anglo-Chilean stock determined by us in connection with the valuation issues will be used in determining the value of the 75 shares of such stock in the settlement under Rule 50.

The petitioner contends that no portion of the trust corpus should be included in the decedent's estate because he did not, at the time of his death, have sufficient power to affect the enjoyment of the income or corpus to require its inclusion; that since the settlor divested himself of all substantial power over the income or corpus of the trust prior to the enactment of section 302 (d), the retroactive application of the section and the inclusion of the trust corpus in his estate is so arbitrary and capricious as to violate the Fifth Amendment to the Constitution; and that, in any event, if any portion of the trust corpus is includable in the gross estate, then (1) the value of the life estate irrevocably given to M. Robert Guggenheim should be excluded; and (2) there should be included only the value, on the crucial date, of those securities which were held by the trustees at the time the decedent relinquished the power to revoke the trust.

The respondent disputes all of the contentions of petitioner and insists that the decedent at the time of his death retained the power

to change the enjoyment of the trust corpus "through the exercise of a power  *  *  *  to alter, amend or revoke  *  *  *"; and that the value of the trust securities as of the date of death should be included in the gross estate under the provisions of section 302 (d) of the Revenue Act of 1926.

The section relied upon requires that there be included in the gross estate of a decedent, the value at the time of his death of all property: "To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend or revoke  *  *  *." By section 302 (h) of the same act, the foregoing provision applies whether the transfer was "made  *  *  *  before or after the enactment of this Act." Similar provisions were in the 1924 Act, but they were not contained in any of the revenue acts prior to 1924.

In support of his contention, respondent points to the following language of the trust agreements of February 14, 1922, and February 4, 1925:

Nothing in this instrument contained shall be deemed to affect or limit the power of the Settlor to modify, alter or correct the provisions of the said trust agreement made as of the 29th day of October, 1917, as amended and modified, provided that any such modification, alteration or correction shall not operate to revoke the said agreement or the trust existing thereunder, or to frustrate the essential purposes of the trust of making provisions for the son of the Settlor and his children or descendants, or to impair the substantial integrity of the trust fund, or to create a beneficial interest in or under the trust, on behalf of the Settlor or any person not previously beneficially interested therein or thereunder.  *  *  *  Nor shall anything in this instrument contained be deemed to affect or limit the power of the Settlor by directions in writing given to the Trustee, to alter, define and prescribe the relative interests of the beneficiaries in the trust fund or the income thereof, their respective shares in the same, their respective powers with respect to such shares, and the time and manner of making distribution to the beneficiaries, or any of them, by way of advancement, postponement or otherwise, of principal or income, or both, of the trust fund; which power of the Settlor is hereby expressly reaffirmed and reserved, together with the power of causing a final distribution to be made at any time to or among the beneficiaries, or any of them, and so terminating the trust.

He relies principally upon the latter portion of the above quotation.

Petitioner argues that the provision giving the settlor the power to "modify, alter or correct" the provisions of the trust agreement conferred upon the settlor no substantial power over the trust corpus or income at the time of his death because, in view of the restrictions upon the power, he could only modify or correct the trust provisions to clarify its meaning, to remove ambiguities, to define more clearly the duties of the trustees and the like; that the pro-

vision that nothing should affect the power of the settlor to "alter, define and prescribe the relative interests of the beneficiaries in the trust fund or the income thereof", relates only to the interests of Robert's children by his first and second marriages, and not to any interest of Robert, the "Beneficiary", and, inasmuch as only one child of Robert by either his first, second, or third marriages was in existence at the time of the decedent's death, the power to vary the relative interests of the "beneficiaries" was meaningless and carried no valuable incidents; and that the power which the settlor reserved to cause a final distribution and terminate the trust did not actually exist at the date of the decedent's death, since it was to come into being only after Robert's death, which had not then occurred. As to the latter power, petitioner argues that even if it should be regarded as a power which existed prior to Robert's death, the mere power to terminate a trust and distribute the proceeds to the beneficiaries is not a power to "alter, amend or revoke" within the meaning of the statute, citing *Helvering* v. *Helmholz*, 296 U. S. 93, and *White* v. *Poor*, 296 U. S. 98.

The cited cases are authority for holding that the mere power to terminate a trust and distribute the proceeds to the beneficiaries is not a power to alter, amend or revoke; but this was not the only power reserved by the settlor. He reserved the power to "alter, define and prescribe the relative interests of the beneficiaries in the trust fund or the income thereof." This is the power which formed the basis of respondent's determination that the trust corpus should be included in his gross estate. The obvious purpose of Congress in enacting section 302 (d), *supra*, was to prevent the avoidance of estate taxes in cases where settlors retained control over trust estates by reserving in themselves the power to alter, amend, or revoke, even though title could not be regained by them. Until the death of the decedent there was always the possibility of the exercise by him of the reserved power to change and alter the relative interests of the beneficiaries. This power to alter and change the economic benefit gave the decedent a substantial control over the trust property, and his death, therefore, was "the source of valuable assurance passing from the dead to the living." *Porter* v. *Commissioner*, 288 U. S. 436. Such power can not be considered a trivial or inconsequential one. *Hoblitzelle* v. *United States*, 3 Fed. Supp. 331; *Holderness* v. *Commissioner*, 86 Fed. (2d) 137; *Commissioner* v. *Chase National Bank of New York*, 82 Fed. (2d) 157; certiorari denied, 299 U. S. 552; *Porter* v. *Commissioner*, *supra*; *Witherbee* v. *Commissioner*, 70 Fed. (2d) 696.

Petitioner contends that the word "beneficiaries" did not include Robert. Pointing out that in many instances, both in the original

agreement and in the amendatory agreement, the word "Beneficiary" referred only to Robert while in several instances the word "beneficiaries" referred only to Robert's children, she concludes that the settlor did not intend to reserve the right to alter Robert's interest, but only to alter the interests of his children. Referring to a paragraph of one of the trust instruments, in which both words were used,—"the income * * * in the hands of the trustee * * * [in the event of revocation] shall be paid over to the Beneficiary, or beneficiaries"—she states that this is "conclusive proof that a distinction was meant to be made." Other circumstances relied upon by her as indicating that the decedent did not have the power to alter Robert's interest were that he had transferred to his brothers the power of "increasing and/or decreasing the amount of the annual payments to be made to" Robert; and that he had provided by way of negation, in the paragraph in which the power "to modify, alter, or correct" was contained, that the trust should not be revoked, its essential purposes should not be frustrated, the substantial integrity of the trust fund should not be impaired, and no beneficial interest on behalf of the settlor or of any person not previously beneficially interested therein, should be created.

It may be that the word "Beneficiary", beginning with a capital letter, referred in the trust instruments only to Robert; but it does not follow that the word "beneficiaries" referred only to Robert's children. All of the persons for whose benefit a trust is created ordinarily are embraced within the meaning of the term "beneficiaries." The beneficiaries of the trust created by the decedent were Robert and his children. That the settlor considered Robert as one of the beneficiaries is apparent from his use of such expressions as "any beneficiary", "a beneficiary", "such beneficiary" and the like in various places in the trust instruments, where it is obvious that he intended to include Robert. In the first sentence of the quoted paragraph he speaks of "making provision for the son of the settlor and his children or descendants." We are satisfied that he had all of them in mind when in the next sentence he reserved the power "to alter, define and prescribe the relative interests of the beneficiaries in the trust fund or the income thereof." The last sentence of the same paragraph lends support to this conclusion; for therein he specifically reserved the power to cause a final distribution to be made among the beneficiaries and so to terminate the trust.

Petitioner's argument that under such a construction of the word "beneficiaries" there would be a conflict between the power reserved to the settlor and that given to his three brothers is not persuasive. The settlor apparently anticipated that there might be some conflict between the provisions of the paragraph under discussion and

other portions of the trust agreements when he provided "Nor shall anything in this instrument contained be deemed to affect or limit the power of the Settlor to alter, define and prescribe the relative interests of the beneficiaries　*　*　*."

We are of the opinion, and hold, that the value of the corpus of the trust must be included in the gross estate of the decedent under section 302 (d), *supra.*

The contention of petitioner that, since the settlor divested himself of all substantial power over the income or corpus of the trust prior to the enactment of section 302 (d), the retroactive application of the section and the inclusion of the trust corpus in his estate is so arbitrary and capricious as to violate the Fifth Amendment to the Constitution, can not be sustained. As heretofore pointed out, the settlor did not divest himself of all substantial power over the income or corpus of the trust either prior to the enactment of section 302 (d) or prior to his death. It is true that in the amendatory trust agreement of February 14, 1922, he relinquished the power to revoke the trust; but the relinquishment of this power did not rid his estate of tax liability inasmuch as he reserved the power to change the relative interests of the beneficiaries. He lived after the passage of the Revenue Act of 1926 and could have given up this reserved power, thus freeing his estate of the tax liability here in controversy. Under such circumstances it does not offend the Fifth Amendment to include the value of the trust securities in his gross estate. *Porter* v. *Commissioner, supra; Commissioner* v. *Chase National Bank of New York, supra.*

Nor can petitioner's contention, that in any event the value of the life estate irrevocably given to Robert should be excluded from the decedent's estate, be sustained. Her statement upon brief to the effect "that the decedent at the time of his death had no power to impair or affect in any way the right of Robert to the income of the trust for his life" is not, in our opinion, the conclusion to be drawn from the instruments. The settlor retained the power of defeating any claim of Robert to a life interest when he reserved the right to change the relative interests of the beneficiaries in the trust fund or the income thereof and to cause a final distribution to be made as he saw fit. Respondent suggests that the existence in decedent's brothers of the power to increase or decrease the payments to Robert made his interest too indefinite to justify its classification as a life estate, and that the brothers were not adverse interests and would undoubtedly have followed the wishes of the decedent in respect of the power assigned to them. While we believe there is some merit in this suggestion, we feel that any discussion of the power decedent might have exercised in conjunction with his brothers over Robert's

interest is unnecessary in view of the fact that the decedent alone was in a position to direct the trustees to do anything he desired with the trust corpus and income so long as new beneficial interests were not created.

The final contention of petitioner is that if any of the trust corpus is includable in the estate, then there should be included only the value at the date of the decedent's death of the securities held by the trustees when the decedent relinquished all substantial powers over the trust on February 14, 1922. She points out that section 302 (d) requires that there be included in the gross estate any interest in property "of which the decedent has at any time made a transfer" where the enjoyment was subject "at the date of his death" to change through the reservation of the power to alter, amend, or revoke. She argues that the statute purports to tax, as part of the decedent's estate, property as to which he had made a transfer prior to death; that the Commissioner's regulations[1] require the valuation of that property as of the date of the decedent's death—not the valuation of that property plus all additions and betterments; and that, therefore, the maximum amount includable in the decedent's estate, if any of the trust corpus is to be so included, is the value at the time of death of the property in the hands of the trustee on February 14, 1922, or $996,588.89.

Petitioner apparently seeks to convey the impression that the difference between $996,588.89, which the parties have stipulated was the value at the time of the decedent's death of the property in the hands of the trustee on February 14, 1922, and $2,289,450.62 (plus the value of 75 shares of Anglo-Chilean stock), which the parties have stipulated was the value at the time of the decedent's death of the securities then comprising the trust corpus, represents the enhanced value of the property at that date due to additions to the property or betterments, by the trustees. Petitioner states that between February 14, 1922, and the decedent's death, he had no control over the investment of the trust corpus; that such control was vested in his three brothers; and that during that time the brothers made some sales of trust securities, substitutions of others, and that there were, undoubtedly, some capital accretions. The result, according to petitioner, was that the value of the corpus of the trust on the date of death was very much greater than the value on the date of death of the securities in the trust when the decedent relinquished the power to revoke.

---

[1] Article 21 of Regulation 70 provides:

"*Valuation of property transferred.*—The value must be determined as of the date of the decedent's death. * * * Where the transferee makes additions to the property, or betterments, the enhanced value of the property at that date, due to such additions or betterments, is not to be included."

While we agree with petitioner that the value of the trust corpus on the date of death was much greater than the value on the same date of the securities held in trust on February 14, 1922, petitioner has not proved to our satisfaction that the enhanced value was due to any "additions to the property, or betterments" made by the corporate trustee, or by the brothers of the decedent. In the fourth and fifth articles of the trust agreement executed on May 28, 1918, the decedent reserved the right of increasing the principal of the trust fund, from time to time by adding thereto other properties, interests and securities, and of substituting properties for properties or securities in the trust fund. The evidence does not show that the increase in the amount and value of the securities was not the result of transfers made by the decedent pursuant to the right which he retained. We must, therefore, hold that the value at the date of death of all of the securities held in the trust at that time should be included in the gross estate of the decedent.

The deficiency shall be recomputed in accordance with the views herein expressed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

SMITH, dissenting: I am of the opinion that the decedent's interest in the old firm at the date of his death was far less than the value determined in the prevailing opinion. In finding 17 it is stated that the principal business of the old firm at the date of decedent's death consisted of the enterprise carried on by the Anglo-Chilean Consolidated Nitrate Corporation. The business of that corporation was in a developmental stage in 1930. It had been operating in the red for a number of years. Synthetic nitrates were largely taking the place of Chilean nitrates. The old firm had invested a vast amount of money in the Anglo-Chilean Consolidated Nitrate Corporation enterprise. There was no certainty that the old firm would ever recover its capital. In point of fact, it was a losing proposition from the beginning. I think that the evidence shows that the old firm stood to lose a large part of its investment in the enterprise. I am of the opinion that the old firm's holding of 1,109,859 shares of the stock of the corporation had no value for the purpose of determining the old firm's assets and I think that its claims against that corporation for moneys advanced were worth far less than one hundred cents on the dollar.