Norman B. Jacobowitz and Laura Jacobowitz v. Commissioner
Jacobowitz v. Commissioner
Docket No. 6319-65.
United States Tax Court
T.C. Memo 1968-261; 1968 Tax Ct. Memo LEXIS 38; 27 T.C.M. (CCH) 1387; T.C.M. (RIA) 68261; November 18, 1968, Filed. *38 1. Held, petitioner realized gain in August 1961, measured by reference to the fair market value of Pictorial Productions, Inc., stock, found to be $4.50 per share, constructively received in exchange for machinery and equipment; held, further, that computation of the gain should be adjusted for payments, totaling $17,348.04, petitioner was required to make to creditors of prior owner of the machinery and equipment. Sidney L. Cramoy, for the petitioners. Leo A. Burgoyne, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in petitioners' joint Federal income tax for 1961 of $20,802.54. Some of the adjustments have been conceded by petitioners. The issues remaining for decision are: (1) Whether petitioners realized gain in 1961 from the exchange of machinery and equipment for stock of Pictorial Productions, Inc., and, if so, the amount of the gain; and, (2) whether 210 shares of stock in The Music Guild, Inc., a small business corporation within the meaning of section 1244 of the Internal Revenue Code of 1954, [1] *39 became worthless in 1961. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference. Petitioners, Norman B. Jacobowitz and Laura Jacobowitz, are husband and wife, and during 1961 resided at Tenafly, New Jersey. Petitioners at the time of the filing of their petition were legal residents of Tiburon, California. They presently reside at Beverly Hills, California. Petitioners maintained their accounts and filed their Federal income tax return for 1961 with the district director of internal revenue, Newark, New Jersey, on the cash basis of accounting and on the basis of a calendar year. Sale of Machinery to Pictorial For 20 or more years prior to 1961, petitioner Norman B. Jacobowitz (hereinafter referred to as "petitioner") was engaged primarily as an engineer and 1388 manufacturer in businesses involving sound and sound reproduction. In 1959, he was the sole stockholder of Sound Plastics, Inc., a corporation engaged in the business of supplying the raw materials from which phonograph records were pressed. One of its customers, B & C Recording, Inc., ran into financial difficulties and, in 1959, turned *40 its stock over to petitioner to afford him the opportunity to salvage the large sum owed to Sound Plastics. B & C Recording, Inc. (hereinafter "B & C"), manufactured and sold phonograph records and, in 1961, also manufactured optical goods, particularly fresnel lenses, made of plastic. A fresnel lens produces in a flat piece of plastic the same curve found in the ordinary magnifying lens. The fresnel lens weighs one-tenth of the weight of a glass lens and can be mass-produced, whereas a comparable glass magnifying lens requires polishing by hand and therefore cannot be mass-produced. The value of the fresnel lens manufactured by B & C lay in its comparative ease of manufacture, its low cost, its comparative safety in construction, its easy portability, and its stability. The manufacturing equipment of B & C could be utilized for either pressing phonograph records or manufacturing optical goods, only slight modifications being necessary to effect a change-over from one operation to the other. B & C had given to its factors a chattel mortgage on its machinery and equipment and the factors assigned the mortgage to Sound Plastics for $21,200, the then balance owing on the mortgage. Sound *41 Plastics then foreclosed on the chattel mortgage and petitioner purchased the machinery and equipment at public auction on February 28, 1961, for $21,200. Petitioner thereafter leased the machinery and equipment to B & C. Pictorial Products, Inc. (hereinafter "Pictorial"), is engaged in research and development in the field of lenticular optics and in the commercial production and sale of various items embodying unique processes utilizing lenticular screens. Lenticular optics is a scientific art involving principles of multiple-lens optics. A series of linear cylindrical lenses (lenticulars) serve to separate series of intermeshed pictures enabling the viewer to observe only a single picture at one time, the picture seen depending on the angle of the view. The lenses manufactured by Pictorial were somewhat similar to the lenses manufactured by B & C. The operations of B & C were brought to the attention of Pictorial by K. R. Smith, an associate of petitioner in B & C. Smith suggested to Victor Anderson, president of Pictorial, that B & C might be able to help Pictorial with some of the problems it (Pictorial) was experiencing with lens molding. Anderson requested that B & C conduct *42 research to see if it could come up with a better way of making Pictorial's lenticular lenses. B & C conducted the needed research and found (1) that Pictorial could utilize a substantially less expensive raw material in its manufacturing processes, (2) that lenses produced at B & C were more stable, that is, they did not change dimensions as easily as the plastic Pictorial was using, (3) that B & C was able to turn out its moldings more quickly, and (4) that B & C had other skills needed by Pictorial. B & C notified Anderson that it had been successful in producing Pictorial's lenses; thereafter Anderson visited the B & C plant, witnessed its production techniques, and became interested about B & C's accomplishments in this area. Anderson suggested that B & C and Pictorial merge or in some way combine their resources, talents, and know-how. Petitioner and his associates entered into negotiations with Pictorial as to the manner in which they could combine. It was decided that Pictorial would acquire the equipment obtained by petitioner at the foreclosure sale for stock, employ petitioner and two of his associates, and give all three individuals options to purchase additional shares *43 of Pictorial stock. Pictorial was disturbed, however, that a question as to the validity of petitioner's title to the equipment might be raised, since at the time petitioner acquired the equipment at the foreclosure sale he was the sole stockholder of both the foreclosing mortgagee (Sound Plastics, Inc.) and the mortgagor (B & C) and there were other creditors of B & C. Pictorial inquired of petitioner as to the extent of B & C's indebtedness and was informed by him that B & C owed its creditors approximately $105,000. However, petitioner estimated that he could satisfy these creditors for $45,000. Pictorial therefore agreed to lend petitioner $45,000 on an interest-free note to enable him to pay off the creditors of B & C. Petitioner agreed to pledge his Pictorial stock to secure the loan. The preliminary negotiations culminated in a letter of intent dated August 10, 1961, 1389 which outlined the various agreements among the parties. The letter of intent reads, in part, as follows: August 10, 1961 Messrs. Norman Jacobowitz K. R. Smith John Bubbers George T. Rosenstein New York, New York
Gentlemen: This will serve as a letter of intent to consolidate our various understandings. A *44 formal agreement will be prepared as expeditiously as possible which will contain such safeguards as we all deem necessary. Pictorial will employ each of you for three (3) years commencing September 1, 1961. * * * The salary of KR will be at the rate of $25,000.00 a year, and the salary of the remainder of you will be at the rate of $15,000.00 a year. The employment of all of you shall be full time and no other employment will be permitted. * * * Stock Options: There will be 17,000 shares of stock available for options, of which KR will be entitled to 6,000, and the remainder of you to 3,667 shares each. The reference to shares shall mean new shares as they are reconstituted after the pending recapitalization of the corporation. This recapitalization provides that one present common share will be exchanged for 15 1/2 new common shares. In order to permit you to exercise your option at any time commencing with option at any time commencing with September 1, 1961, the agreement will be couched in terms of old shares and will make reference to the recapitalization, bearing in mind that the offering price of the new shares will be $10 a share and the old shares will be computed at $147.25 *45 per share (15 1/2 X 9.50). I am sure that this price will qualify for a capital gain treatment under the appropriate provisions of the Internal Revenue Code, and that we will be able to justify a statement that as at the time the right to exercise the option was first granted, the price was at least 95% of current market value. The options of each will be exercised only during an employment period, as required by the Code, and one-half will be exercisable after the first year of employment, and the balance after the second year of employment. The option agreement will contain the same provisions as does the agreement of the Andersons as to purchase of stock for investment and as to non-assignability of options prior to exercise and receipt of the stock. General: It is understood that the acquisition of the property hereinafter referred to and the agreements to be entered into are to be interdependent on each other, and the failure or refusal of any one of you to consummate any agreement will entitle Pictorial at its option, to rescind as to all agreements. Assets to be Acquired: Pictorial will acquire all of the assets on the schedules submitted by you, in exchange for 11,250 shares *46 of new stock, which will be held by the seller for investment. Pictorial's counsel must be satisfied as to the ability of the seller to convey good title, free and clear of encumbrances, and all requirements of law must be met. The purchase price shall include all attributable taxes. Jacobowitz will warrant that all equipment is in operating condition, and that if any of it fails to function within thirty days after first use, he will cause the same to be repaired at his own expense. Appropriate adjustments will be made for any defective or damaged equipment beyond repair. Previous Associations: Some or all of you have previously been associated with Westbury Vinyl Corp., Banco Electroforming Corporation and B & C Recording, Inc. Your character and reputation is [sic] of the essence of this agreement to Pictorial and to the underwriters. You will therefore agree to pay or privately compromise all debts, and that there will be no insolvencies proceedings or judgments with repect to these corporations. You will agree to obtain assignments of all contracts of Westbury for lenses and Banco for electroforming, including but not limited to those you have described as Amphenol, Woolensac *47 and Boesel. Between the time of the signing of this letter of intent and the formal agreements, you will provide us with any and all documents relating to the aforementioned corporations, for inspection and copy, except such technical information as you deem confidential until formal agreements are signed. All of you will individually represent that there are no judgments against you, and that there are no lawsuits pending against you, that you have been previously involved in no bankruptcy proceedings, and that you know of no reason why you cannot perform all the terms and conditions of the various agreements on your part to be performed. A material misrepresentation by any one of you shall be considered a misrepresentation of all. You agree that you will execute any instruments required by counsel for the underwriter, SEC counsel for Pictorial, or the SEC, providing the same does not incur any obligation on your part, it being 1390 understood that the documents shall be for information purposes only or in connection with letters of investment or other matters relating to your stock ownership. With respect to the exercise of the stock options, there shall be an exception to the rule *48 that the options may be exercised only during an employment period. In the event we terminate without cause and if such termination occurs within the first year of employment, you may nevertheless exercise the right to acquire one-half of the total amount of the options, within three months after the date of discharge. If the discharge occurs during the second year of employment, you may have the right to exercise the options with respect to the balance of the stock within three months after the date of discharge. If you require a loan for the purpose of paying off the creditors or otherwise discharging debts of the corporation, we will make a non-interest bearing loan to you in the sum of $45,000.00, of which $15,000.00 shall be repaid within one hundred and twenty days, and the balance within a year thereafter. In such event, you will post your stock as collateral. Very truly yours, PICTORIAL PRODUCTIONS, INC. By (signed) Kay Anderson AGREED TO AND ACCEPTED: (signed) Norman B. Jacobowitz (signed) K. R. Smith (signed) John J. Bubbers (signed) George T. Rosenstein On August 20, 1961, by the following Bill of Sale petitioner transferred machinery and equipment to Pictorial Productions, *49 Inc.: KNOW ALL MEN BY THESE PRESENTS, that the undersigned, NORMAN B. JACOBOWITZ, residing at 127 Oak Street, Tenafly, New Jersey, party of the first part, in consideration of the sum of ONE ($1.00) Dollar and other good and valuable considerations in hand paid, at or before the ensealing and delivery of these presents by PICTORIAL PRODUCTIONS, INC., party of the second part, the receipt whereof is hereby acknowledged, has bargained, sold and by these presents does grant and convey unto the said party of the second part all of the machinery, equipment and appurtenances set forth in Schedule A, annexed hereto and made a part hereof. That the conveyance of the property referred to and identified in Schedule A is being made by the party of the first part to the party of the second part in consonance with the tenor and intendment of a certain letter of intention dated August 10, 1961, signed by the party of the second part, which said letter of August 10, 1961, provides, among other things, that the undersigned NORMAN B. JACOBWITZ will pay, settle, compromise or otherwise discharge all creditors of B & C RECORDING INC.; and in consideration of the within transfer, the party of the first *50 part does hereby agree to accept in full payment of the property described in the annexed schedule eight thousand seven hundred fifty (8,750) shares of fully paid, non-assessable shares of PICTORIAL PRODUCTIONS, INC. That, by accepting the aforesaid eight thousand seven hundred fifty (8,750) shares of stock in PICTORIAL PRODUCTIONS, INC., the undersigned acknowledges that all said shares of stock are being acquired for investment and not for distribution, and in the event of a transfer of any or all of said shares of stock forming the consideration for the within transfer, the holder, his heirs, successors, administrators and assigns shall deliver to PICTORIAL PRODUCTIONS, INC. a representation in writing that such shares are being acquired in good faith for investment and not distribution. TO HAVE AND TO HOLD the said machinery, equipment and appurtenances unto the said party of the second part, its successors and assigns forever. AND the party of the first part does hereby covenant and agree to and with the said party of the second part to warrant and defend the sale of the aforesaid machinery, equipment and appurtenances hereby sold unto the party of the second part, its successors *51 and assigns against all and every person and persons whomsoever. IN WITNESS WHEREOF, the party of the first part has hereunto set his hand and seal this 29th day of August, 1961. (signed) Norman B. Jacobowitz Norman B. Jacobowitz
STATE OF NEW YORK
COUNTY OF NASSAU SS.: NORMAN B. JACOBOWITZ, being duly sworn, deposes and says that he resides at 127 Oak Street, Tenafly, New Jersey, and that he is the sole owner of all of the machinery, equipment and appurtenances described in and more specifically enumerated in the schedule hereto annexed and made a part of the foregoing bill of sale. That your deponent states that there are no mortgages, liens, condition sales agreements or other encumbrances of whatever nature or description affecting the said machinery, equipment and appurtenances 1391 set forth in the foregoing schedule and that they are absolutely free and clear thereof. That he is indebted to no one and has no creditors. That there are no actions pending against him in any court nor are there any replevins, judgments or executions outstanding against him now in force; nor has any petition in bankruptcy or arrangement proceedings been filed by or against him, nor has he taken advantage *52 of any law relating to insolvency. That this affidavit is made for the express purpose and with the intent of inducing PICTORIAL PRODUCTIONS, INC. to purchase the property set forth and described in the foregoing bill of sale, knowing full well that they will rely upon this affidavit and deliver and transfer to him the consideration hereinbefore referred to, and otherwise act in accordance with the tenor and intendment of the letter of intent signed by PICTORIAL PRODUCTIONS, INC. on August 10th, 1961. This affidavit is also made in lieu of compliance with the Bulk Sales Law of the State of New York and to assure PICTORIAL PRODUCTIONS, INC. that he has no creditors who are entitled to the statutory notice of sale. (signed) Norman B. Jacobowitz Norman B. Jacobowitz Sworn to before me this 29th day of August 1961. GEORGE J. SANDLER NOTARY PUBLIC State of New York
No. 41-3446975 Qualified in Queens County Term Expires March 30, 1963 * * * On August 29, 1961, Pictorial as employer and petitioner as employee entered into an employment contract to commence September 1, 1961, and terminate August 31, 1964. Under the employment contract petitioner was to be employed as Assistant to the President *53 in charge of the Electroforming and Molding Divisions. Material provisions of the employment contract were as follows: 4. The EMPLOYEE shall receive as and for his sole compensation, with the exception of certain stock options provided in an agreement dated today, the sum of Fifteen Thousand Dollars ($15,000) per annum, payable in equal weekly installments during the term of this agreement. The EMPLOYEE shall incur no expenses without the approval of the President or Vice-President of the EMPLOYER. * * * 9. The parties acknowledge that the EMPLOYER has been induced to enter into this agreement as the result of certain representations made by the EMPLOYEE and by others, which representations are contained in a letter agreement of intent dated the 10th day of August, 1961. Said letter of intent requires the performance not only by the EMPLOYEE but by others of certain conditions which are considered to be of the essence of this agreement. The said letter of intent is hereby incorporated herein by reference, and shall be made a part hereof as to any matters not otherwise contained herein. As to matters which are contained herein, this agreement shall control. * * * 14. This agreement, *54 the letter of intent described in paragraph 9 hereof and the stock option agreement referred to in paragraph 4 hereof constitute the entire agreement between the parties, and all other understandings, oral or written, have been merged herein. This agreement cannot be changed except in writing signed by both parties and shall be binding upon the parties, their heirs, executors and assigns. On August 29, 1961, Pictorial as the company and petitioner as employee entered into a stock option agreement, the material provisions of which are as follows: 1. Grant of Option. The Company grants to the Employee the right and option to purchase from the Company, on the terms and considerations hereinafter set forth, all or any part of an aggregate of 3,667 shares of the authorized, issued and outstanding $.20 par value common stock of the Company, at the purchase price of $9.50 per share (being at least 95% of the fair market value per share of the Company's $.20 par value common stock on the date hereof) as the Employee may from time to time elect, exercisable at the times and for the number of shares as follows: (a) on or after September 1, 1962, 1834 shares; and (b) on or after September 1, *55 1963, 1833 shares. No partial exercise of such option shall be for less than 100 full shares. In no event shall the Company be required to transfer fractional shares to the Employee. Except as the time may be foreshortened by paragraph 3 hereof, the right to exercise the option contained herein shall terminate on November 30, 1964. * * * 6. Stock as Investment. By accepting this option, the Employee acknowledges for himself, his heirs and legatees that 1392 any and all shares purchased hereunder shall be acquired for investment and not for distribution, and upon the transfer of any or all of the shares subject to the option granted hereunder, the Employee, or his heirs or legatees receiving such shares, shall deliver to the Company a representation in writing that such shares are being acquired in good faith for investment and not for distribution. In the event that the Employee disposes (whether by sale, exchange, gift, or any other transfer) of any shares of stock acquired pursuant to the exercise of the option granted hereunder, within six months after the transfer of such shares to him upon his exercise of such option, he will notify the Company in writing within thirty days *56 after such disposition. In August 1961 Pictorial and petitioner entered into the following pledge agreement: August 1961 To: Pictorial Productions, Inc. Having borrowed from you the sum of $45,000.00, which is to be repaid to you as follows: $15,000.00 on 120 days from date, and $30,000.00 on one year from date, which said sums are secured by my two non-interest bearing promissory notes made in your favor for said amounts and bearing even date, I have, for further securing repayment of said sum, deposited with you eight thousand seven hundred fifty (8,750) shares of stock of Pictorial Productions, Inc., endorsed by me in blank, to be held by you upon the following terms: If I should make default in the repayment of the sum advanced by you to me, you may, at any time, on giving me fifteen days' notice in writing, by registered mail, of your intention so to do, without being liable for any diminution in price which may have taken place in the meantime, and without any further consent by me, sell the said 8,750 shares of stock at public sale, according to law, and retain out of the proceeds the amount then due you and all costs attending the said sale; and any balance, if any remaining, *57 shall be paid to me. In the event of such sale, no claim or demand for any deficiency, if any, will be made upon me, it being understood between us that in the event you exercise your right of sale, then and upon the sale of stock, my indebtedness to you upon the said two promissory notes shall cease, expire and come to an end. In the event of my death prior to the time when you have the right to exercise the sale provision as hereinbefore provided, then in that event, thirty (30) days' written notice shall be given by you to my executor or administrator; and if no such person has qualified at that time, then such 30 days' notice shall be given to my attorneys, Sandler & Honorof, 306 Fulton Avenue, Hempstead, New York. (signed) Norman B. Jacobowitz Norman B. Jacobowitz The undersigned, Pictorial Productions, Inc., agrees to hold the 8,750 shares above referred to upon the terms and conditions hereinabove set forth. PICTORIAL PRODUCTIONS, INC. By [Signature illegible] Included in the pledge agreement was a provision that in the event Pictorial ever moved against the collateral for the $45,000 loan, no claim or demand for any deficiency would be made against petitioner. Although the *58 note agreement states that petitioner deposited with Pictorial 8,750 shares of stock, endorsed by petitioner in blank, petitioner never physically deposited any shares nor did he ever endorse a stock certificate in blank. No Pictorial stock certificate was issued to petitioner in 1961, nor was a Pictorial stock certificate bearing petitioner's name in existence in that year. Petitioner's name did not appear as a stockholder on Pictorial's stock records in 1961. Petitioner first appeared as a stockholder of record of Pictorial stock on the books of the transfer agent, Morgan Guaranty Trust Company of New York, on January 24, 1962. No stock certificate was tendered to petitioner in 1961 for his endorsement. The first such tender occurred in December 1964. Petitioner contacted the creditors of B & C on August 15, 1961. In settlement of their claims against B & C the creditors were offered the alternatives of 25 percent to be paid in five installments over a period of one or two years or 15 percent in cash. None of the creditors accepted the installment basis. Petitioner started making payments to the creditors of B & C on August 25, 1961, and during that year paid the creditors $17,348.04. *59 The payments of $17,348.04 satisfied all the known creditors of B & C except six creditors who had outstanding claims totaling $8,835.08. Petitioner transferred funds from his personal savings account to his checking account to cover these payments. He received the proceeds of the $45,000 loan from Pictorial on September 10 or 11, 1961. Included in the $17,348.04 are two payments which, although technically not 1393 payments to creditors of B & C, were treated by the parties as such, and have been included by us in that figure to avoid confusion. These two payments consisted of $1,584 paid to Finebilt Manufacturing Co. of Los Angeles and $210 paid to Pictorial. These payments were necessitated by petitioner's warranty that the equipment transferred to Pictorial be in operating condition. Six press heads were not functioning and petitioner personally replaced them at a cost of $1,584. The $210 was a reimbursement for the freight cost thereon, which Pictorial had paid. Of the $45,000 loan from Pictorial, petitioner repaid $12,500. The balance was canceled on April 20, 1965. At the time of the August 1961 transaction, Pictorial was planning a public offering of its common stock. To facilitate *60 the public offering Pictorial effected a recapitalization. As of August 21, 1961, Pictorial had outstanding 27,782 shares of common stock, $1 par value, and 26,936 of second preferred stock, no par value. On that date, Pictorial increased its authorized capital to one million shares of common stock, $0.20 par value, exchanged 15 1/2 shares of the new common for 1 share of the old common, and exchanged 1/2 share of the new common for 1 share of the second preferred. The total outstanding shares of new common stock as of August 21, 1961, was 444,089 shares. On January 3, 1961, Pictorial had issued 200 shares of its $1 par value common stock to Irving Zuckerman in consideration for services valued at $2,000. On the same date, an identical transaction was consummated between Pictorial and Nathan Shapiro. After the 15 1/2 for 1 split in August 1961, therefore, Zuckerman and Shapiro each had 3,100 shares of the new $0.20 par value common stock, with a cost basis of $0.65 per share. On July 10, 1961, partners and employees of C.E. Unterberg, Towbin Co., an underwriting firm, purchased the post-recapitalization equivalent of 10,013 shares of Pictorial common for $6 per share. A prospectus *61 dated November 14, 1961, issued prior to the public offering of Pictorial stock, states the following in relation to these shares: * * * Such shares have been registered under the Securities Act of 1933, but the purchasers have advised that the shares were purchased for investment and that there is no present intention of making a public offering thereof. Prior to any public offering of such shares by or any public offering of such shares by or on behalf of such purchasers, a posteffective amendment to the Registration Statement will be filed setting forth, among other things, the terms and conditions of such offering. To the extent that the purchasers may in the future sell those shares at a price in excess of $6 per share, such profit may be deemed to be additional underwriting compensation for purposes of the Securities Act of 1933. On August 29, 1961, Pictorial filed with the Securities and Exchange Commission Form S-1, a Registration Statement, covering two blocks of the corporation's common stock, par value $0.20 per share, one block consisting of 149,178 shares and the other block consisting of 59,691 shares. Of the shares of common stock to be registered, 25,000 shares were *62 to be sold by Pictorial, and the balance by certain of the stockholders of Pictorial, to the underwriting firm of C.E. Unterberg, Towbin Co., New York City. All of the shareholders whose stock was registered thereby are listed in the Registration Statement. Petitioner's name was not included in the listing. Petitioner's shares were not registered on August 29, 1961, or thereafter. As of August 29, 1961, there was no established market for Pictorial stock and no quoted price. The Registration Statement disclosed a tentative offering price of $10 per share. Pictorial's stock had a book value of about $1.50 per share. As required by law, Pictorial filed a prospectus concerning the stock offered to the public. For the five years ended May 31, 1961, Pictorial reported the following results of operation: Years ended
May 31,
1957
1958
1959
1960
1961
(Unaudited)
(Unaudited)
Net sales
$732,434
$894,966
$705,392
$1,389,522
$1,855,628
Costs and expenses:
Cost of sales
441,944
543,723
526,311
876,337
1,118,046
Selling, general and
127,717
149,998
125,625
229,538
298,656
administrative
expenses
Interest
3,664
9,895
8,772
6,142
569,661
697,385
661,831
1,114,647
1,422,844
Income before
162,773
197,581
43,561
274,875
432,784
Federal income taxes
Provision for
80,348
91,800
13,694
131,244
215,821
Federal income taxes
Net income for the
$ 82,425
$105,781
$ 29,867
$ 143,631
$ 216,963
year
Earnings applicable
$ 81,903
$105,259
$ 29,345
$ 143,109
$ 216,441
to common stock (a)
Number of common
414,313
419,738
422,838
427,876
434,076
shares outstanding
at end of each year
(b)
Earnings per share
$.20
$.25
$.07
$.33
$.50
of common stock (b)
Cash dividends paid
None
per share of common
stock
*63 The prospectus contained the following additional note concerning the earnings of Pictorial: In the three months ended August 31, 1961, net sales were approximately $389,840 and net income was approximately $46,478 ($.10 per share based on the 455,339 shares outstanding at the end of said period), as compared with net sales in the corresponding months of 1960 of approximately $466,591 and net income in said period of approximately $58,619 ($.14 per share based on the 427,876 shares outstanding at the end of said period). In the months of September and October, 1961, net sales were approximately $118,445 and $101,587, respectively, as compared with approximately $221,508 and $272,635, respectively, in September and October, 1960. Although net income figures for September and October, 1961, are not available, they were lower than the monthly net income in the preceding three months and lower than the net income in September and October, 1960. Both sales and net income in the five months of June through October, 1960, represented more than those months' proportionate share of the sales and net income for the full fiscal year ended May 31, 1961, due in large part to a heavy volume of sales *64 of the Company's products in connection with the 1960 Presidential election, and the results of operations for the three months period ended August 31, 1961, and the succeeding months of September and October, 1961, are not necessarily indicative of the results that may be realized for the fiscal year ending May 31, 1962. * * * Moreover, the 1960 earnings were distorted by the waiver of salary and pension benefits by key officers and employees of Pictorial and by an unusually high volume of sales of items used in the 1960 political campaign. Had full compensation been paid, earnings for the fiscal year ended May 31, 1961, would have been reduced by more than $19,000. Pictorial owned no basic patents for the manufacture or sale of lenticular lenses. By agreement, Pictorial gave the underwriters the right to maintain the market price of the common stock at a level above that which might otherwise prevail in the open market. This "stabilizing the market" is achieved by the underwriters' buying stock on their own account to prevent a rapid drop in the market. If a stock is overpriced at original issue, stabilizing by the underwriters would keep the stock from reaching its true lower value. *65 Pictorial's stock was issued publicly on November 15, 1961. It sold at about $10 per share through the end of 1961; thereafter, the underwriters ceased stabilizing the price and it dropped sharply. In the second quarter of 1962, the bid price reached $2.25 per share, remaining in the $2-$3 range for the next two years. These prices are for registered shares. The names and qualifications of petitioner and his three associates had been displayed rather prominently in the Registration Statement and in the prospectus. Nevertheless, within a week after the public flotation petitioner was discharged from employment by Pictorial. Two months later Rosenstein was discharged. A month after that Bubbers was let out and K. R. Smith was discharged shortly thereafter. Petitioner sought redress from Pictorial under his employment contract and on January 25, 1962, entered into a settlement agreement with Pictorial, under the terms of which petitioner was to receive $5,000 in full settlement and release of his claim against Pictorial. No stock certificate was tendered to petitioner at that meeting. Nor did petitioner execute his promise to collateralize the stock. A stock certificate in petitioner's *66 name for 8,750 shares of Pictorial Productions, Inc., common stock was issued for the first time on January 24, 1962. At no time did petitioner endorse the certificate; the assignment provision on the reverse side of the stock certificate is blank. The certificate was sent to Morgan Guaranty Trust Company by Pictorial Productions, Inc., on May 19, 1965, with an accompanying letter stating that the purchase price was $2.125 per share. On his tax return for 1961, petitioner reported gain from the sale of the equipment to Pictorial as a long-term capital gain of $8,671.30, computed as follows: Gross Sales Price
$48,125.00
Less: Cost or Other Basis
Cost of Equipment
$21,000.00
Payment to B & C Creditors
* 17,453.70
Expenses of Sale
** 1,000.00
39,453.70
$ 8,671.30 1396 Petitioner computed the gross sales price by valuing the 8,750 shares of Pictorial stock at $5.50 per share. Respondent, in his notice of deficiency, increased the long-term capital gain from the sale of equipment to $66,500, computed as follows: Gross Sales Price
$87,500
Less: Cost of Equipment
21,000
$66,500 Respondent valued *67 the 8,750 shares of Pictorial stock as of August 29, 1961, at $10 per share. Respondent now concedes that the fair market value of the 8,750 shares of Pictorial stock as of that date was no more than $86,344.62, the value placed on petitioner's equipment in Pictorial's books. Music Guild Stock The Music Guild, Inc. (hereinafter "Music Guild"), was organized on January 19, 1960, by James Grayson to manfacture and sell phonograph records of esoteric works of music. The corporation intended to produce and sell by mail recordings of works not otherwise available in retail outlets or ordinary record catalogues. Petitioner was active in the management of Music Guild until September 1, 1961, the date his employment with Pictorial commenced. Music Guild was a "small business corporation" within the meaning and intendment of section 1244. Petitioner had paid $21,000 in cash for 210 shares of capital stock of Music Guild, which stock was "section 1244 stock." Petitioner retained his stock ownership throughout the year 1961. Grayson estimated that there were a million record collectors in the United States and that Music Guild would be successful if 1 1/2 percent (15,000) purchased its records. *68 It was anticipated that 8,000 members would be attracted in the first year and that each subscriber would purchase four or five records at a price of four to five dollars per record. Accordingly, it was anticipated that about $20 apiece would be received from 8,000 subscribers or a total amount of $160,000 in the first year. Sometime prior to June 1961, Music Guild made its initial mail solicitation of orders. From the 20,000 letters sent, the corporation received approximately eight replies. In August 1961, petitioner advised Grayson that he no longer desired to continue with the corporation. On October 2, 1961, petitioner and Grayson executed an agreement whereby petitioner granted Grayson an option to purchase his stock for $5,000 until October 31, 1961, and at $100 per share from October 31, 1961, through December 31, 1962. Petitioner agreed with Grayson not to sell, pledge, hypothecate, or otherwise encumber his shares until after December 31, 1962. The following are condensed income and net worth statements of Music Guild for the periods ending December 31, 1961-1962: 1397 Condensed Income Statement for Years
Ended December 31, 1961-1962
1961
1962
Sale of Records
$ 8,439.30
$26,588.04
Cost of Sales
4,044.10
19,997.16
Gross Profit on Sales
$ 4,395.20
$ 6,590.88
Other Income
$ 1,370.07
$ 905.00
Total Gross Profit
$ 5,765.27
$ 7,495.88
Operating Expenses
$53,160.67
$52,753.90
Net Loss
($47,395.40)
($45,258.02)
Condensed Net Worth
Statement for Years
Ended December 31,
1961-1962 (to the
nearest dollar)
1961
1962
Current Assets:
Cash
$ 1,831
$ 992
Accounts Receivable
621
2,585
Inventory
11,067
14,735
Prepaid Expenses
15,547
149
Total Current Assets
$29,066
$18,461
Less Current
Liabilities:
Accounts Payable and
$19,785
$33,171
Accrued Expenses
Payroll and Excise Taxes
506
1,435
Loans Payable -
5,500
Shareholder
Loans Payable - Bank
535
24,800
Total Current
$26,326
$59,406
Liabilities
Net Working Capital
$ 2,740
($40,945)
Plus:
Fixed Assets
$3,965
$3,171
Organization Exp.
120
Less:
Long Term
Liabilities
$8,100
($ 4,135)
$9,000
($ 5,709)
Net Worth
($ 1,395)
($46,654)
In *69 early 1963, Music Guild was taken over by ABC Paramount and liquidated. Petitioner, in early 1963, received $5,000 from Paramount. Ultimate Findings of Fact On August 29, 1961, petitioner transferred certain machinery and equipment to Pictorial in exchange for 8,750 shares of Pictorial stock which he constructively received stock which he constructively received on that date. The fair market value of the Pictorial stock received by petitioner was $39,375 ($4.50 per share). During 1961, petitioner expended $17,348.04 pursuant to the terms of the sales contract. These expenditures are deductible from the gross sales price in computing his gain or loss on the transaction. Petitioner's stock in Music Guild did not become worthless in 1961. Opinion Sale of Machinery to Pictorial In August 1961, petitioner transferred machinery to Pictorial, for which he was to receive 8,750 shares of Pictorial stock. Petitioner did not receive any stock certificates in 1961, and his name did not appear on the stock books of Pictorial's transfer agent until 1962. However, he received the proceeds of a $45,000 loan from Pictorial in 1961 for which the stock was pledged as security. The first question for *70 decision is whether there was a completed sale or exchange of petitioner's machinery and equipment in 1961. If there was a completed sale, we must then determine how much gain, if any, petitioner realized on the transaction. Code section 451(a) provides that a cash basis taxpayer shall include in his gross income the amount of any item of gross income received by him during the taxable year. [2] Petitioner contends that he received no reportable gross income from the disposition of the machinery in 1961 because, he argues, the transaction was not completed and he did not receive the stock in that year. In the alternative, petitioner contends that even if he received the Pictorial stock in 1961, the transaction would not be reportable in that year because he was required to pledge the stock to Pictorial as collateral for the $45,000 loan. Petitioner *71 concedes that the fact he did not receive a stock certificate in 1961 is not determinative of whether he actually or constructively received stock in that year. See Wesley H. Morgan, 46 T.C. 878, 890-891 (1966), and cases cited therein. However, he contends, one does not receive stock until his name is entered in the corporate stock records; until that time, "he may have a right to stock, enforceable at law, but he is not yet a stockholder." We perceive this to be a distinction without a real difference. The real question is whether petitioner had an enforceable right to demand that the stock be delivered to him at any time in 1961 or otherwise to receive economic benefit from ownership of the stock during that year. Petitioner maintains that there is no promise to transfer the stock in any contract signed by Pictorial. But the consideration for the transfer of the machinery is recited in the letter of intent, signed by Pictorial, and the letter is specifically referred to in the Bill of Sale signed by petitioner, which again recites the consideration. Whether the two documents are considered as evidence of a bilateral contract, or the Bill of Sale is considered evidence of a unilateral *72 contract fully performed, an enforceable promise existed. No provision in either document restricts petitioner's right to the stock as consideration for the transfer. Petitioner contends, however, that no enforceable right to receive the stock existed in 1961 because Pictorial's obligation was conditioned on petitioner's satisfying the creditors of his corporation, B & C, before he was to acquire the stock. We disagree. We do not read either the letter of intent or the Bill of Sale to state such a condition. Cf. Bonham v. Commissioner, 89 F. 2d 725 (C.A. 8, 1937), affirming 33 B.T.A. 1100 (1936). We believe that the clear meaning of the various instruments is that petitioner acquired a vested right to the stock, as well as the right to pledge it to secure the $45,000 loan. The effect is the same as if the stock certificate had been issued to petitioner and he then transferred the certificate to 1399 Pictorial, as collateral, in exchange for the loan. Merely because the intermediate step was eliminated does not alter the result: by pledging the stock and receiving the proceeds of the loan petitioner clearly had the economic benefit of the stock in 1961. Petitioner relies on Estate *73 of W. F. Williamson, Petitioner relies on Estate of W. F. Williamson, 29 T.C. 51 (1957), wherein we held that a cash basis taxpayer-seller, required by the purchaser to leave the proceeds of a corporate stock sale as a loan to the benefit of the purchaser, did not realize income in the year of sale in the absence of collection of the debt in that year. But Williamson dealt with a seller-lender (not a seller-borrower such as petitioner), who received no economic benefit in the year of the sale. Here, petitioner received the economic benefit of the sale proceeds through the pledge of his shares to secure the $45,000 loan. Petitioner's reliance on Williamson is misplaced. Petitioner contends, however, that, since all of B & C's creditors were not paid in all of B & C's creditors were not paid in 1961, IT WAS NOT POSSIBLE TO COMPUTE HIS GAIN IN THAT YEAR. But we do not read Samuel C. Chapin, 12 T.C. 235 (1949), affd., 180 F. 2d 140 (C.A. 8, 1950), relied on by petitioner, to support his contention. Chapin is distinguishable on its facts. In that case, neither title nor possession of the land passed in 1943, and the loans required by the purchasers to consummate the transaction were not *74 received until the following year. Moreover, since our decision in Chapin, the Supreme Court has decided Commissioner v. Arrowsmith, 344 U.S. 6 (1952), wherein it held that expenses in a subsequent year arising out of a capital transaction in a prior year may be related back to the earlier transaction for the purpose of determining their character. Thus, in the present case, the fact that petitioner might have to pay other creditors in subsequent years did not prevent the transaction from being "closed" in 1961, when he received the economic benefit of the stock. Having concluded that the sale was completed in 1961, we turn to the computation of the amount of the gain. The first problem is the determination of the effect of the payments by petitioner to B & C's creditors. Under the terms of the Bill of Sale by which petitioner transferred the machinery to Pictorial, petitioner agreed to "pay, settle, compromise or otherwise discharge all creditors of B & C." Pursuant to this agreement, necessitated by Pictorial's concern that the B & C creditors might attempt to set aside petitioner's title to the equipment as a fraudulent conveyance, petitioner paid $17,348.04 to B & C's creditors *75 in 1961 and, in computing his gain, deducted the payments as part of his adjusted basis of the machinery. [3] Respondent contends that the payments of $17,348.04 may not be taken into account in computing petitioner's gain because the claims of B & C's creditors were not a cloud on petitioner's title. In making this argument respondent assiduously avoids taking any position as to what was the character of the payments. We do not deem it necessary to resolve the highly technical question, *76 propounded by respondent, whether under New York or New Jersey law, whichever is applicable, petitioner acquired unassailable title to B & C's machinery in the foreclosure sale. The letter of intent of August 10, 1961, specifically provided that "Pictorial's counsel must be satisfied as to the ability of the seller to convey good title, free and clear of encumbrances, and all requirements of law must be met." The Bill of Sale, executed on August 29, 1961, recited that the conveyance of the machinery was being made "in consonance with the tenor and intendment" of the letter of intent which was stated to provide that petitioner was to pay, settle, compromise or otherwise discharge all creditors of B & C. Thus, the parties to the machinery sale, and particularly Pictorial's counsel, were of the view that, in the light of all the facts surrounding the foreclosure sale, settlement with B & C's creditors was necessary in order to enable petitioner to convey good title. We think that is sufficient to permit petitioner to capitalize the $17,348.04 paid to B & C's creditors as part of his basis for the machinery and equipment. [4] *77 Alternatively, petitioner argues, but does not urgently insist, that, if the $17,348.04 payment is not includable in his adjusted basis for the machinery and equipment, the payment is deductible as an ordinary expense of obtaining employment with Pictorial. Having sustained petitioner's principal argument, we do not consider his alternative position. Next, in computing the gain, we must determine the value of the consideration received by petitioner in the sale. Code section 1001 provides that the amount realized from the sale of property is the sum of money received plus the fair market value of other property received. In the instant case, petitioner received 8,750 shares of Pictorial stock in exchange for the machinery, and the parties disagree as to the fair *78 market value of the stock on August 29, 1961, the date of the sale. In his notice of deficiency, respondent determined that the fair market value of the Pictorial stock received by petitioner was $87,500 ($10 per share). Respondent now is willing to concede that the stock had a fair market value of no more than $86,344.62 ($9.87 per share), this being the value placed on the acquired machinery by Pictorial. Of course, Pictorial's determination of value is not binding on petitioner. In deed, Pictorial's interests would be best served by a high valuation of the machinery for purposes of depreciation. In other contexts we have rejected book value as a proper determination of fair market value, see George A. Nye, 50 T.C. 203, 216 (1968), and cases cited, and we do not think the book value used by Pictorial is controlling here. Since we do not know the fair market value of the equipment, [5] we must determine the fair market value of the stock received by petitioner by looking elsewhere. In essence, respondent relies on the public offering price of Pictorial stock in November 1961, of $10 per share. Petitioner, who originally valued the stock at $5.50 per share on his 1961 return, now contends *79 that his Pictorial stock was worth no more than $1 per share, and introduced expert testimony to support his valuation. We have considered all the evidence and are satisfied that the fair market value of petitioner's Pictorial stock as of August 29, 1961, was substantially less than $10 per share. Cf. Estate of Daniel Guggenheim, 39 B.T.A. 251, 302 (1939), affd. on this issue 117 F. 2d 469 (C.A. 2, 1941), certiorari denied 314 U.S. 621 (1941). However, we believe that petitioner's new valuation is too low, and have found as a fact that the stock was worth $4.50 per share as of the crucial date. As we have noted in our findings, there were a few sales of Pictorial stock in early 1961 for no more than $0.65 per share.[6] On July 10, 1961, Pictorial sold a block of its stock to its underwriters for a price of $6 per share. [7] Finally, the stock was offered to the public in November 1961 at $10 per share. Neither party contends that the underlying business of the corporation justified this disparity in prices. *80 Petitioner's expert witness testified that, in his opinon, the offering price was "insane." While we are certainly not bound by his opinion, a careful review of the financial data and other information contained in the record lends strong support to a conclusion that the price was excessive. Indeed, we note that the bid price of the stock dropped to $2.25 in the second quarter of 1962, after the underwriters ceased providing price support. A prospectus issued in November 1961 discloses that Pictorial's average earnings for the five years ending May 31, 1961, were $0.27 per share. This figure is inflated by the earnings for the fiscal year ending May 31, 1961, which to some degree represented waivers of compensation by key personnel and non-recurring *81 sales of paraphernalia for the presidential campaign of 1960. No dividends were paid on the common stock during this entire period. Nothing in the business of the company justified a price-earnings multiple of 40, which was the approximate multiple at the offering price. Indeed, petitioner's expert witness, Morris Cohon, testified that a similar company sold 1401 for a multiple of six when it "went public" in early 1961. Moreover, although substantial blocks of other Pictorial stock were registered, petitioner's stock was unregistered. This meant that he could not freely sell his stock on the market, and any private purchaser would be equally bound by this restriction. Cohon testified, and we agree, that this would have a substantial effect on the true "fair market value," particularly since other similar registered shares were being sold over the counter. Cf. Edith G. Goldwasser, 47 B.T.A. 445 (1942), affd. per curiam 142 F. 2d 556 (C. A. 2, 1944); Victorson v. Commissioner, 326 F. 2d 264 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court. We believe, however, that Cohon's valuation of petitioner's stock at $1.10 per share is considerably too low. We note that Cohon testified *82 that he refused to join in an underwriting of a similar company because he felt it over-priced, and that another underwriting firm agreed to take over the flotation. Similiarly, a number of underwriters participated in the offering of the Pictorial stock. Thus, Cohon's opinion appears to be more conservative than the public opinion which was reflective of fair market value of the stock in August 1961. Using our best judgment after a careful review of the record, we have concluded that petitioner's Pictorial stock had a fair market value of $4.50 per share in August 1961. Music Guild Stock Music Guild, Inc., was a corporation organized by James Grayson to manufacture and sell phonograph records by mail, specializing in esoteric works not otherwise obtainable. Sometime in 1961, petitioner purchased 210 shares of Music Guild stock for $21,000, primarily because of Grayson's favorable projection of the corporation's future. Petitioner contends that his stock became worthless in 1961, basing his argument on the alleged insolvency of the company in that year, and the demonstrated failure, he maintains, of the basic concept of the business. We hold that petitioner has failed to prove that *83 the Music Guild stock became worthless in 1961. As our findings disclose, the corporation suffered an operating loss of approximately $47,000 in 1961, leading to a deficit of $1,395. However, the corporation's current assets exceeded its current liabilities at the end of the year, and there was no showing that current obligations could not be paid as they matured. Moreover, the corporation continued to operate in 1962, and was able to obtain a bank loan in excess of $24,000 in that year. Also, in 1962, the corporation completely liquidated a loan payable to Grayson in the amount of $5,500. These factors militate against a finding of worthlessness in 1961. Cf. Estate of C. L. Hayne, 22 T.C. 113, 118-119 (1954); Anthony P. Miller, Inc.,, 7 T.C. 729, 745-748 (1946), affd. as to this issue 164 F. 2d 268, 270 (C.A. 3, 1947), certiorari denied 333 U.S. 861 (1948). While such facts may not preclude a finding of worthlessness, see Charles W. Steadman, 50 T.C. 369 (1968), they do place upon petitioner the duty to offer more than his own testimony and the corporate books to support his view. We note, for example, that Grayson was not called to testify. Cf. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165 (1946), *84 affd. 162 F. 2d 513 (C.A. 10, 1947). On this issue we must hold for respondent. In view of our decision on the issues presented, Decision will be entered under Rule 50. Footnotes
1. All section references are to the I.R.C. of 1954, as amended, unless otherwise noted.
*. Now stipulated to be $17,348.04. ↩
**. Petitioner now concedes that he is not entitled to expenses of sale of $1,000.↩
2. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule. - The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.↩
3. Whether these payments should be treated as additions to the adjusted basis of the machinery (as costs of removing a cloud on title, see James E. Caldwell & Co., 234 F. 2d 660 (C.A. 6, 1956), reversing 24 T.C. 597) or as reductions from the amount realized (as expenditures discharging an obligation incurred as part of the sale, Duveen Brothers, Inc., 17 T.C. 124 (1951), aff'd 197 F. 2d 118 (C.A. 2, 1952), certiorari denied 344 U.S. 884↩ (1952)) need not now be decided. Regardless of the characterization of the payments, the tax result would be the same - they would reduce the amount of gain produced by the transaction. Thus, for ease of discussion, we will treat them as additions to the adjusted basis.
4. Included in the $17,348.04 are expenditures of $1,584 for the replacement of certain machine parts and $210 for freight thereof made by petitioner pursuant to a warranty, given as a part of the 1961 transfer, that the machinery transferred was in operating condition, and that he would repair at his own expense any equipment found faulty. We think petitioner properly deducted these amounts from the sale price in computing his gain. See Estate of James M. Shannonhouse, 21 T.C.422↩ (1953).
5. Our lack of knowledge as to the fair market value of the equipment renders a "barter equation," such as that used in Moore-McCormack Lines, Inc., 44 T.C. 745↩ (1965), inapplicable.
6. The shares sold in these transactions were the old common stock, $1 par value. The prices have been adjusted to reflect the recapitalization undergone by Pictorial prior to consummation of the transactions with petitioner.↩
7. The shares sold in these transactions were the old common stock, $1 par value. The prices have been adjusted to reflect the recapitalization undergone by Pictorial prior to consummation of the transactions with petitioner.↩